FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC<br><br>Plaintiff,<br><br>v. | |
| GOOGLE LLC. | Case No. 2:19-cv-90-JRG<br>LEAD CASE |
| AKAMAI TECHNOLOGIES, INC. | Case No. 2:19-cv-89-JRG |
| NETFLIX, INC.<br><br>Defendants. | Case No. 2:19-cv-91-JRG |

**PMC'S OPPOSITION TO NETFLIX'S MOTION TO DISMISS OR TRANSFER**

# REDACTED

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## **TABLE OF CONTENTS**

**Page**

I.    ARGUMENT ................................................................................................................. 3

    A.    Venue is Proper in the Eastern District of Texas ...................................................... 3

        1.    Netflix's OCA Servers are Physical Places of Business ............................ 4

        2.    Netflix OCAs are Regular and Established ............................................... 13

        3.    Netflix's OCAs are "of Netflix" .............................................................. 14

        4.    The Court Should Not Revisit its *Seven Networks* Ruling ....................... 17

    B.    The Case Should Remain in the Eastern District of Texas .................................... 19

        1.    Judicial Economy Weighs Strongly Against Transfer Because the Eastern District Is Highly Familiar with PMC's Patents ....................................... 19

        2.    The Remaining Private Factors Are Neutral or Weigh Against Transfer. 24

II.   CONCLUSION ........................................................................................................... 30

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACQUIS LLC v. EMC Corp.*,
    67 F. Supp. 3d 769 (E.D. Tex. 2014) ...................................................................................35

*AGIS Software Dev. LLC v. Apple, Inc.*,
    2018 WL 2721826 (E.D. Tex. 2018) ....................................................................................36

*Blitzsafe Texas, LLC v. Bayerische Motoren Werke AG*,
    No. 2:17-CV-00418-JRG, 2018 WL 4849345 (E.D. Tex. Sept. 6, 2018) ..............................23

*In re Cray Inc.*,
    871 F.3d 1355 (Fed. Cir. 2017).................................................................................... *passim*

*CXT Sys., Inc. v. Container Store, Inc.*,
    2019 WL 1506015 (E.D. Tex. Apr. 5, 2019) ...................................................................30, 34

*Gemalto, S.A. v. HTC Corp.*,
    2011 U.S. Dist. LEXIS 133612 (E.D. Tex. Nov. 18, 2011) .................................................35

*In re Genentech, Inc.*,
    566 F.3d 1338 (Fed. Cir. 2009)...........................................................................................35

*GeoTag, Inc. v. Starbucks Corp*,
    2013 WL 890484 (E.D. Tex. Jan. 14, 2013)........................................................................30

*In re Google*,
    2017 WL 977038 (Fed. Cir. 2017).......................................................................................30

*Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*,
    2019 WL 2959568 (E.D. Tex. 2019) ...............................................................................33, 34

*Kahn v. Gen. Motors Corp.*,
    889 F.2d 1078 (Fed. Cir. 1989)...........................................................................................34

*Mass Engineered Design, Inc. v. SpaceCo Bus. Solutions, Inc.*,
    2016 WL 6824415 (E.D. Tex. Mar. 28, 2016) .....................................................................35

*Personal Audio, LLC v. Apple, Inc.*,
    2010 WL 582540 (E.D. Tex. Feb. 11, 2010) .......................................................................36

*Seven Networks, LLC v. Google (Seven Networks II)*,
    2018 WL 4026760 (E.D. Tex. Aug. 15, 2018) ............................................................. *passim*

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

*Stragent, LLC v. Pioneer Elecs (USA) Inc.*,
  2013 WL 8467476 (E.D. Tex. 2013) .................................................................... 33

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
  137 S. Ct. 1514 (2017) .................................................................................... 10

*U.S. Ethernet Innovations, LLC v. Samsung Elecs. Co.*,
  2013 WL 1363613 (E.D. Tex. Apr. 2, 2013) ........................................................ 34

*Uniloc USA, Inc. v. Samsung Elecs. Am.*,
  2018 U.S. Dist. LEXIS 176337 (E.D. Tex. Sept. 18, 2018) .................................... 36

*VirtualAgility, Inc. v. Salesforce.com, Inc.*,
  2014 WL 459719 (E.D. Tex. Jan. 31, 2014) ........................................................ 35

*WEB Telephony, LLC v. Comcast Corp.*,
  2010 WL 3860305 (E.D. Tex. Sept. 30, 2010) .................................................... 33

**Statutes**

28 U.S.C. § 1400(b) ............................................................................................ 8, 10

America Invents Act ............................................................................................ 30

**Other Authorities**

The Court Should Not Revisit its *Seven Networks* Ruling ........................................ 24

John Harvey, Mary "Kazie" ................................................................................... 33

Redmon Dec. Ex. 1 .............................................................................................. 8

Redmon Dec. Ex. 4 .............................................................................................. 16

Redmon Dec. Ex. 5 .............................................................................................. 16

Redmon Dec. Ex. 6 .............................................................................................. 17

Redmon Dec. Ex. 16 ............................................................................................ 22

Redmon Dec. Ex. 18 ............................................................................................ 22, 23

Redmon Dec. Ex. 42 ............................................................................................ 32

Redmon Dec. Ex. 46 ............................................................................................ 32

Redmon Dec. Ex. 48 ............................................................................................ 36

Rule 45 ............................................................................................................... 34, 35

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

It is undisputed that Netflix maintains numerous Open Connect Appliance ("OCA") servers in the District in order to "localiz[e] Netflix traffic as close as possible to [its] members." *See* Redmon Dec. Ex. 1 (Netflix Open Connect Overview) at 1. To the outside world, Netflix characterizes these OCAs as "our OCAs," and it touts its OCA coverage in the Eastern District (among other places) to highlight the reach of its network. In *Seven Networks, LLC v. Google LLC*, this Court explained that a defendant's servers and the servers' locations in the District can meet all the elements for a "regular and established place of business" under 28 U.S.C. § 1400(b) as long as the defendant exercises sufficient control over them. 315 F. Supp. 3d 933 (E.D. Tex. 2018) (citing *In re Cray Inc*., 871 F.3d 1355 (Fed. Cir. 2017)). The OCAs do so for Netflix here.

Netflix, however, defends against venue by resort to a legal fiction. In Netflix's view, its purported ██████████████████████████ when Netflix deploys them in the District inoculates it from this Court's reasoning in *Seven Networks*. But, "[i]n deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts." *In re Cray*, 871 F.3d at 1362. And in *Seven Networks*, this Court looked through a purported "Service Agreement," seeing it for the lease it truly was. *See Seven Networks*, 315 F. Supp. 3d at 949 ("Google's GGC servers are housed in spaces in the District leased by Google."). The Court should do the same in this case. The facts here demonstrate that ████████████████ is form over substance, insofar as Netflix exercises substantial control over both the digital and physical aspects of the OCAs and their installation locations in the District even after it purports to ██████████████. The transfer is more about Netflix's avoiding property taxes on the OCAs than it is about ceding authority over them to the ISPs. Indeed, in practice ████████████████████████████████████████████

████████████████████████████████████████████

1

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████

████████████████████████████████████

      In short, there is no express requirement in the case law that a defendant must have formal legal title over a location in order for that location to be a "regular and established place of business"—indeed, Netflix's proposed rule, taken to its logical extreme, would allow defendants to avoid venue by leasing rather than purchasing property. Netflix's talismanic invocation of █

███████████████ thus cannot defeat venue here, where Netflix provides servers to ISPs, █████████

███████████████████████████████████████████████████████████, and then represents to the outside world that those servers are "Netflix's" servers.

      Netflix also fails to meet its burden to show the case alternatively should be transferred for convenience. Transfer to the Northern District of California would abandon this Court's extensive familiarity with PMC and its family of patents in favor of a court which has never substantively adjudicated PMC's patents. PMC has filed no less than 9 complaints in this District since 2008. In at least 6 of those cases, PMC has presented technical tutorials to the Court on its patents and related technology. After familiarizing itself with patent specifications that are common to these patents-in-suit, the Court has construed numerous terms that are likely to be relevant to claim construction in this case. Furthermore, the Court has ruled on the patentability of PMC's patents in at least 3 cases. As such, it would squander judicial economy to move this case out of this District. Moreover, the remaining transfer factors, including the location of witnesses and documents, are either neutral or weigh against transfer. Accordingly, Netflix's motion should be denied in its entirety.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# I. ARGUMENT

## A. <u>Venue is Proper in the Eastern District of Texas</u>

"Any civil action for patent infringement may be brought in the judicial district where the defendant resides, <u>or</u> where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b) (emphasis added); *see also TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1519 (2017) ("[Section] 1400(b) 'is the sole and exclusive provision controlling venue in patent infringement actions.'") (*quoting Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 229 (1957)). If, as here, a domestic corporation does not reside in the district the case is filed, venue is still proper if it (1) committed acts of infringement in the district and (2) has a regular and established place of business in the district when the cause of action accrued. *See In re Cray Inc.*, 871 F.3d at 1360.

As to the first requirement, Netflix admits it has placed OCA servers in the District, ███ ████████████████████████████████████████████████████ ████████████████████████████ and PMC's complaint alleges that Netflix has committed acts of infringement in this District through those OCAs, *see, e.g.*, Complaint ¶¶ 4, 13, 33, 39 (". . . A Netflix video player receives one or more TCP/IP packets, which include audio/video signals (the first medium) for the title requested by the user through the Netflix software, and preview thumbnail images for that title (the second medium), <u>with the audio/video signals received from the Netflix OCA</u> (a source external to the receiver station) in a digital data channel, such as a TCP connection; . . ." (emphasis added).[1]

Thus, the only question the Court needs to address to resolve Netflix's motion is whether the OCAs are a "regular and established place of business." The Federal Circuit has explained that

---

[1] Netflix agrees that it "is not asking the Court to find improper venue based on the 'acts of infringement' requirement." Motion to Dismiss at 6.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

a "regular and established place of business" sufficient to support venue is (1) a physical place of business; (2) regular and established; and (3) it is a place "of the defendant." *See In re Cray*, 871 F.3d at 1360. "In deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts." *Id.* at 1362. As explained in further detail below, Netflix's OCAs and their locations in the District meet the *In re Cray* elements, as already applied by this Court in *Seven Networks*, 315 F. Supp. 3d 933.

### 1.   <u>Netflix's OCA Servers are Physical Places of Business</u>

A physical place of business need not be a "fixed physical presence in the sense of a formal office or store." *In re Cray* at 1362 (quotations omitted). It must only "be a physical, geographical location in the district from which the business of the defendant is carried out." *Id.* This Court has already held that physical servers, and the space in which they are housed, that "actively service a distinct business need" of a defendant can be a physical place of business for the purposes of patent venue. *Seven Networks*, 315 F. Supp. 3d at 956.

There can be no dispute that Netflix's OCAs actively service its business needs by enabling Netflix to efficiently deliver Netflix content to its subscribers. As Netflix itself explains:

> The overall mission of the [OCA] program is to enable ISPs to provide a great Netflix experience for our mutual customers. We further this goal by localizing Netflix traffic as close as possible to our members, limiting the network and geographical distances that our video bits must travel during playback. This of course benefits Netflix members, but it also benefits ISPs and internet users in general. In short, we invest in efficiency innovations and increasing the capacity of the internet to support playback requests for Netflix content - so that others don't have to.



Ex. 1 at 1; *see also* ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *cf. Seven Networks*, 315 F. Supp. 3d at 957 (servers

4

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

may "function as local data warehouses, much like a shoe manufacturer might have warehouses around the country").

Netflix OCAs in the District, and the physical space they occupy, are "more than merely a virtual space or electronic communications from one person to another." *Seven Networks*, 315 F. Supp. 3d. at 951 (quoting *In re Cray*). Like the Google GGC servers in *Seven Networks*, an OCA in the District is a "place" because it is "specifically localized: a physical server occupying a physical space." *Id. See also* ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████     ██████████

████████████████████████████████████████████████████

████████████████████████████████████     Although

Netflix purports to ███████████████████████     ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████     ████████████████████████████

████████████████████████████

For example, ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

- How quickly ISPs must install the OCAs ("You must be able to physically install OCAs at your assigned site within 10 business days of receipt, or as soon as possible thereafter."), Dkt. No. 62-12 (Nguyen Ex. 11 (Netflix Open Connect Appliance Deployment Guide ("Deployment Guide")) at 5;

- The physical connection ISPs must provide for the OCAs ("You must be able to provision 2-4 x 10 Gbps ethernet ports in a LACP LAG per OCA. The exact quantity depends on the OCA type."), *id.*;

- The power supply ISPs must provide for the OCAs ("750W"), *id.*;

- The network capacity for the ISP facilities ("[Y]ou must have the capacity to handle 1.2 Gbps of inbound traffic for a 12-hour period per appliance."), *id.*;

- The temperature at which ISPs must keep their facilities ("Consistent room temperatures" of "[n]o higher than 78°F (26°C)" and "[m]aximum room temperatures" of "[n]o higher than 104°F (40°C) for very short periods of time only"), *id.* at 9;

- The direction that OCAs, once installed, must face ("For storage and global OCAs, optics face the cold aisle[,]" and "[f]or flash-based appliances, optics face the hot aisle."), *id.* at 10;

- The manner of inbound and outbound filtering ISPs are permitted to use for the OCAs ("Traffic from OCA" must "[a]llow all destination addresses and ports[,]" whereas "[t]raffic to OCA" must "[a]llow TCP 22, 53, 80, 179, 443, UDP 53 and 123 (source and destination), ICMP types 0, 3, 8, 11, and all ICMPv6 from any public IP/port[,] as well as "[a]llow all return traffic from any appliance-initiated connection (TCP established)."), *id.* at 15;

- Whether the OCAs may be installed in a cluster, *see id.* at 20-21, 23;

- The circumstances under which the OCAs, once installed, may be relocated by the ISPs ("If you need to make changes to the OCAs in an established site - for example, if you intend to relocate an OCA from one site to another or disable one or more OCAs for a significant period of time - it is important to notify the Open Connect team so that they can make the necessary changes to the cluster configuration."), *id.* at 20;

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

- Whether ISPs may keep components of the OCAs they purportedly ███████ ██████████ ("[W]e may ask partners to replace PSU or optics on an appliance. In such cases we will ship the replacement part to the partner, and we might also request that they return the defective part."), *id.* at 46; and

- ████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████[2]

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████  ██████████

---

[2] ████████████████████████████████████████████████████████
████████████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Second, Netflix controls the "physical space within which the [OCAs are] located and maintained." *Seven Networks*, 315 F. Supp. 3d at 951. As explained above, ███████████

8

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Netflix also requires ISPs notify Netflix before OCAs are

relocated from "an established site," Deployment Guide at 20, ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

    <u>Third</u>, Netflix exercises substantial "control over the physical" OCA servers themselves.

*Seven Networks*, 315 F. Supp. 3d at 951. Although Netflix purports to ███████████████████

██████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ including requiring ISPs provide specified power supply and physical

connections for the OCAs, *see* Deployment Guide at 5; ████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ and even

specifying the direction OCAs must face within ISP facilities, *see* Deployment Guide at 10.  The

failure to abide by any of these requirements would be in derogation of the Deployment Guide,

███████████████████████████████████████████████████

    In truth, Netflix's ███████████████████████ is illusory, and both Netflix and the ISPs treat

it that way. For example, Netflix documentation provides that ISPs will be required to return OCAs

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

and OCA components to Netflix at Netflix's request—a concept completely foreign to ████

████████████████ *See* Deployment Guide at 46. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

Moreover, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER



FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER



and control is a legal fiction; Netflix retains substantial control itself.

In *Seven Networks*, this Court held that Google's rigorous control over its GGC servers and the ISP facilities in which they were stored in the District—for example, specific requirements with respect to "rack space, power, [and] network interfaces" or requirements to return equipment to Google—demonstrated "the installation of Google's own servers in a physical space *that becomes Google's*." 315 F. Supp. 3d at 952 (emphasis in original). The same result is warranted here, for the same reasons. Netflix's "total control over" the OCA servers' "physical presence within the ISP" facilities "exemplifies how the physical presence of the [OCA] server[s] within this District" comprise far more than a mere "virtual space or electronic communications," and instead establish that "there is a physical place which this Court may examine to determine if it is a regular and established place of business and whether it is a place of the defendant." *Id.* at 953 (citing *In re Cray*, 871 F.3d at 1362).

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

### 2. <u>Netflix OCAs are Regular and Established</u>

The Federal Circuit has explained that a "regular" place of business is "operate[d] in a "steady, uniform, orderly, and methodical" manner[.]" *In re Cray*, 871 F. 3d at 1362 (citations and alterations omitted). In other words, a business is "regular" if it is not "sporadic," like "a <u>series</u> of [business] acts" is not sporadic. *Id.* (emphasis added). A business is "established" where it is "settled certainly, or fixed permanently." *Id.* at 1363 (citations and alterations omitted). For example, "a five-year continuous presence in the district demonstrates that the business was established for purposes of venue[.]" *Id.*



demonstrate that Netflix OCAs in the District are both regular and established.

—far longer than the five-year presence the Federal Circuit opined "demonstrates that [a] business was established." *In re Cray*, 871 F. 3d at 1363.

Indeed,

. Where even "a month-to-month agreement which has endured for years is clearly 'regular and established[,]" *Seven Networks*, 315 F. Supp. 3d at 957, Netflix's OCAs in the District are as well.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Netflix argues its OCAs are not regular and established because they are not "permanent," and because ISPs do not need to "seek advanced permission from Netflix" to move them or "even give notice of such a move." Motion to Dismiss at 9. As a threshold matter, "permanency" is not a statutory requirement. An "established" business may be "settled certainly" and not "fixed permanently." *In re Cray*, 871 F. 3d at 1363. Netflix's OCAs in the District are at the very least "settled certainly" because they are subject to █████████████████████████. And Netflix's argument that its OCAs are not settled because they could be unilaterally relocated by ISPs is contradicted by its own Deployment Guide ████████████████████████████████ ██████), which demands that ISPs <u>do</u> notify Netflix if they "intend to relocate an OCA from one site to another." Deployment Guide at 20. Moreover, even if Netflix's ISP partners have some limited ability to move previously-installed OCAs—limited by Netflix's requirements with respect to the OCA's power supply, direction, physical connection, temperature, and more, *see supra* pp. 6–7—there is no evidence that they are moved around ISP facilities with any regularity.

### 3.      <u>Netflix's OCAs are "of Netflix"</u>

A defendant must "establish <u>or</u> ratify the place of business" in order for it to be a place "of the defendant." *In re Cray*, 871 F.3d at 1363 (emphasis added). In determining whether a place of business is a place "of the defendant," a court should consider whether the defendant "exercises . . . attributes of possession or control over the place." *Id.* A defendant's sufficient possession or control over the place may be shown through, for example, "a defendant's representations that it has a place of business in the district[,]" by a defendant's "list[ing] the alleged place of business on a website[,]" or a defendant's "[m]arketing or advertisements" which "indicate that the defendant itself holds out [the] place for its business." *Id.*

As explained above, Netflix exercises extensive control over the OCAs and the space in which they are located by, for example, mandating how quickly they must be installed, the type of

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

physical connection ISPs must provide for the OCAs, the power supply ISPs must provide for the OCAs, the temperature at which ISPs must keep their facilities, the direction the OCAs should face, ███████████████████████████████████. *See supra* pp. 5-7.

Moreover, Netflix holds out the OCA servers as its own places of business by consistently referring to them in marketing materials and other public statements as "Netflix OCAs" and "our OCAs." *See, e.g.* Redmon Dec. Ex. 16 at 2 (Netflix and Fill blog post) ("We then group <u>our OCAs</u> one step further into *fill clusters*." (underline added)); 4 ("<u>[W]</u>e have thousands of appliances embedded <u>within many ISP networks</u> around the world." (emphasis added)); Ex. 17 (Open Connect Appliances overview) at 2 ("We tailor deployment and hardware architectures for each ISP that we work with. <u>Our Open Connect Appliances</u> are based on commodity PC components, assembled in custom cases by our suppliers." (emphasis added)); Ex. 19 (Optimizing TLS for High–Bandwidth Applications in FreeBSD) at 4 ("The first results from our TLS enabled machines can be seen in Fig 7 this shows a plot of throughput of one of <u>our OCAs</u> . . ." (emphasis added)); Ex. 20 (Improving High–Bandwidth TLS in the FreeBSD kernel) at 1 (". . . [W]e demonstrated the cost of TLS encryption on high–bandwidth video serving on <u>Netflix's OpenConnect Appliance</u> . . ." (emphasis added)). Netflix represents to customers that Netflix's distributed server network, composed of Netflix OCAs housed within local ISPs, including in the Eastern District of Texas, is a critical part of its business. *See* Redmon Dec. Ex. 18 (How Netflix Works With ISPs Around the Globe to Deliver a Great Viewing Experience blog post) at 1 ("<u>We</u> now have Open Connect Appliances in close to 1,000 separate locations around the world." (emphasis added)). Indeed, Netflix specifically touts its OCAs in the Eastern District of Texas by displaying on its public-facing website a map highlighting ISPs in the Eastern District of Texas, explaining that "[t]his map of <u>our network</u> gives you a sense for how much this effort has scaled in the last five years."

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER



*Id.* (emphasis added); *see also* Ex. 2 at 58:24-59:3 ("███████████████████

███████████████████████████████████████

███████████████████████). Through these actions, Netflix at least ratifies the

OCAs and the space in which they are located as its own. *See Blitzsafe Texas, LLC v. Bayerische*

*Motoren Werke AG*, No. 2:17-CV-00418-JRG, 2018 WL 4849345, at *8 (E.D. Tex. Sept. 6, 2018)

(defendant "adopted and ratified the dealerships within the District as its places of business" where

it displayed them on its website as places its business was conducted).

     Netflix argues its OCAs are not "of Netflix" because Netflix ████████████████

█████████████. As a threshold matter, there is no legal requirement that a defendant

have title to a place of business in order for it to be "of the defendant." On the contrary, the Federal

Circuit has explained that "no precise rule has been laid down and each case depends on its own

facts." *In re Cray*, 871 F.3d at 1362. Moreover, Netflix's purported transfer of "control" is in name

only. As explained above, Netflix retains control of the OCAs and the facilities where they are

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

installed. Netflix also argues its OCAs are not "of Netflix" because it does not host business invitees in facilities in the District or have signs on the buildings. As this Court has noted, that is inapposite because "the 'place' of the 'place of business' is not the room or building of the ISP but rather [the] server and the space wherein it is located." *Seven Networks*, 315 F. Supp. 3d at 965.

### 4.   The Court Should Not Revisit its *Seven Networks* Ruling

Netflix OCAs meet the statutory requirements for patent venue under § 1400(b). The Federal Circuit has cautioned that patent venue "analysis must be closely tied to the language of the statute." *In re Cray*, 871 F.3d at 1362. Netflix nonetheless urges this Court to revisit its decision in *Seven Networks* and instead adopt a bright-line rule that servers and the spaces in which they are located can <u>never</u> be places of business under § 1400(b), relying on *Personal Audio, LLC v. Google, Inc.*, 280 F.Supp.3d 922 (E.D. Tex. 2017). But this Court has already explained that "neither the statute nor the Federal Circuit's guidance in *In re Cray* permit the result reached by" the court in *Personal Audio*. *Seven Networks*, 315 F. Supp. 3d at 950. Netflix's proposed bright-line rule is also inconsistent with controlling Federal Circuit precedent that "no precise rule has been laid down and each case depends on its own facts." *In re Cray*, 871 F.3d at 1362.

Netflix also argues that servers are merely "equipment," and therefore more like "things," "objects," or "chattel" than "places" sufficient to establish patent venue. Netflix's argument is flatly contradicted by this Court's decision in *Seven Networks*. *See, e.g.*, 315 F. Supp. 3d 939 n.5 (a server, once installed for use, is a place because it is a "particular portion of space, considered as separate and distinct from the rest of space; a particular locality, spot, or site; position" (citations omitted)). Because Netflix OCAs are <u>installed</u> by ISPs in physical locations in the District, *see supra* pp. 3, 5–7, they are comparable to "fixtures"—which, because they are "attached," are "regarded as an irremovable part of the real property" and can be contrasted with "equipment" or "chattel," which is not "attached." Redmon Dec. Ex. 21 (Black's Law Dictionary (11th ed. 2019),

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

fixture); *see also Seven Networks*, 315 F. Supp. 3d at 952 ("Once installed, it is considered a permanent fixture."). For that reason, Netflix's protestation that this Court's holding in *Seven Networks* is "in substantial tension" with Federal Circuit precedent regarding the nature of a "place" of business is wrong. *See In re Cray*, 871 F.3d at 1362 (a "place" of business need only be a "physical, geographical location"); *In re Cordis Corp.*, 769 F.2d 733, 737 (Fed. Cir. 1985) ("[T]he appropriate inquiry is whether the corporate defendant does its business in that district through a permanent and continuous presence there and not as Cordis argues, whether it has a fixed physical presence[.]"). The Federal Circuit has <u>never</u> held that a server and the space in which it is installed cannot be a "place" of business. On the contrary, the Federal Circuit denied mandamus review of this Court's *Seven Networks* decision, *In re Google LLC*, No. 2018-152, 2018 WL 5536478, at *3 (Fed. Cir. Oct. 29, 2018), suggesting it is not erroneous as Netflix claims. At bottom, Netflix urges that this Court's *Seven Networks* decision leads to limitless venue that would distort the intended scope of the patent venue statute. That argument is not persuasive, because ultimately the outcome of each case will depend on its specific facts.

"[T]he venue statute is 'designed to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial.'" *Seven Networks*, 315 F. Supp. 3d at 945 (quoting *Utterback v. Trustman Natl Bank*, 716 F. App'x. 241, 244 (5th Cir. 2017). There is nothing unfair or inconvenient about requiring Netflix—a multinational company that chose to serve its customers in this District by establishing places of business in this District and even advertising those places of business on its website for its customers, to answer suit here. Netflix OCAs and the space in which they are housed meet the statutory requirement of a regular and established place of business under § 1400(b). Therefore, venue is proper and Netflix's motion should be denied.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**B.**   **The Case Should Remain in the Eastern District of Texas**

A defendant seeking to transfer venue bears the burden to show that its proposed venue is clearly more convenient than the original venue. Otherwise the plaintiff's choice of venue must be respected. *In re Volkswagen of Am., Inc. (Volkswagen II)*, 545 F.3d 304, 315 (5th Cir. 2008). Whether venue transfer is appropriate under 28 U.S.C. § 1404(a) requires consideration of both private and public interest factors. *Id.* The factors are to be evaluated "based on 'the situation which existed when suit was instituted.'" *In re EMC Corp.*, 501 Fed. Appx. 973, 976 (Fed. Cir. 2013).

The private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Volkswagen I*, 545 F.3d at 315 (quotations omitted). Public interest factors to be considered are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* at 315 (quotations omitted). Considering the relevant factors demonstrates that Netflix's motion to transfer should be denied.

**1.**   **Judicial Economy Weighs Strongly Against Transfer Because the Eastern District Is Highly Familiar with PMC's Patents**

In evaluating the judicial economy of transfer, the Federal Circuit has held that courts may properly consider the familiarity of both the transferor and transferee venues with the patents at issue and related technology. *In re Eli Lilly & Co.*, 541 Fed. App'x 993, 994 (Fed. Cir. 2013) ("Deference is particularly appropriate in the present case given the Central District of California's prior familiarity with the patents and opportunity to resolve two cases involving the same product

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

and patents"); *see also In re ASUS Computer Int'l*, 573 Fed. App'x 928, 929 (Fed. Cir. 2014) (denying mandamus where judicial economy disfavored transfer).

This is not PMC's first case before this Court—the Court is highly familiar with PMC's family of patents, and PMC has repeatedly enforced its patents in different cases before this Court:

- *PMC v. TCL Corp.*, 2:17-cv-00433-JRG;

- *PMC v. Hisense Co.*, 2:17-cv-00437-JRG-RSP;

- *PMC v. Tsinghua Tongfang Co.*, 2:17-cv-00439-JRG;

- *PMC v. Haier Am. Co.*, 2:17-cv-00438-JRG;

- *PMC v. Funai Elec. Co.*, 2:16-cv-00105-JRG-RSP;

- *PMC v. Samsung Elecs. Am., Inc.*, 2:15-cv-01754-JRG-RSP;

- *PMC v. Apple, Inc.*, 2:15-cv-01366-JRG-RSP;

- *PMC v. Zynga, Inc.*, 2:12-cv-00068-JRG-RSP;  and

- *PMC v. Motorola, Inc.*, 2:08-cv-00070-RSP.

In contrast, the Northern District of California has never substantively adjudicated PMC's patents.

Netflix argues that the patents-in-suit have not been sufficiently litigated in this Distrct to affect judicial economy. That is misleading because PMC's family of patents all share common parentage and are part of a family of related inventions. The patents-in-suit, U.S. Patent Nos. 7,747,217 (the "'217 Patent"), 7,769,344 (the "'344 Patent", 7,865,920 (the "'920 Patent), 8,601,528, 8,739,241 (the "'241 Patent"), and 9,674,560, stem from the same common applications and all claim priority to those prior applications.[3] And the '217 Patent, asserted in this case, has

---

[3] *See* U.S. Patent No. 9,674,560 ("Continuation of application No. 08/113,329, filed on Aug. 30, 1993, now Pat. No. 7,856,650, which is a continuation of application No. 08/056,501, filed on May 3, 1993, now Pat. No. 5,335,277, which is a continuation of application No. 07/849,226, filed on Mar. 10 1992, now Pat. No. 5,233,654, which is a continuation of application No. 07/588,126, filed on Sep. 25, 1990, now Pat. No. 5,109,414, which is a continuation of application No. 07/096,096, filed on Sep. 11, 1987, now Pat. No. 4,965,825, which is a continuation-in-part of

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

itself previously been litigated by PMC in this Court. Therefore, this Court's previous work with respect to PMC's entire patent portfolio generally, and the '217 Patent specifically, is highly relevant to this case.

In at least six of these cases, PMC and its opponents have presented technical tutorials to the Court regarding PMC's family of patents. *See* Redmon Dec. Ex. 22 (*PMC v. TCL* Tech Tutorial); Redmon Dec. Ex. 23 (*PMC v. Hisense* Tech Tutorial); Redmon Dec. Ex. 24 (*PMC v. Funai* Tech Tutorial); Redmon Dec. Ex. 25 (*PMC v. Samsung/Vizio* Tech Tutorial; Redmon Dec. Ex. 26 (*PMC v. Apple* Tech Tutorial); Redmon Dec. Ex. 27 (*PMC v. Zynga* Tech Tutorial).

The Court has also construed terms in the same patent family that appear in asserted claims in this case. By way of examples, the Court has construed[4]:

- **"Media" and "medium"[5]:**

    o *PMC v. TCL Corp.*, 2018 WL 3207436, at *7–9 (E.D. Tex. June 29, 2018) (Gilstrap, J.), Redmon Dec. Ex. 28;

    o *PMC v. Apple, Inc.*, 2016 WL 6299860 (E.D. Tex. Oct. 26, 2016) (Payne, Mag. J.) (construing for purposes of Phase Two disputes and for the *Samsung* case),[6] Redmon Dec. Ex. 29;

---

application No. 06/829,531, filed on Feb. 14, 1986, now Pat. No. 4,704,725, which is a continuation of application No. 06/317,510, filed on Nov. 3, 1981, now Pat. No. 4,694,490"); U.S. Patent No. 8,739,241 (same); U.S. Patent No. 8,601,528 (same); 7,865,920 (same except Patent No. 7,856,650 had not yet been issued); 7,769,344 (same except Patent No. 7,856,650 had not yet been issued); U.S. Patent No. 7,747,217 (same except Patent No. 7,856,650 had not yet been issued).

[4] This list is meant to be illustrative, not exhaustive. Other overlapping claim terms exist, such as "processor," relevant to all asserted claims of the '217, '344, and '528 Patents, *PMC v. Zynga*, 2013 WL 4630447, at *7–9, Ex. 32; "programming" relevant to all asserted claims of the '344, '920, '528, '241, and '560 Patents, *PMC v. Apple*, 6247054, at *15–17, Ex. 31; and "control signal," relevant to claim 20 of the '217 Patent, claim 32 of the '528 Patent, and all claims of the of '241 and '560 Patents, *PMC v. Apple*, 2016 WL 6299860, at *45–46, Ex. 29.

[5] All asserted claims of the '217 patent.

[6] *Cf.* Referral Order RG-72-1, Civil Actions Assigned to Judge Rodney Gilstrap (referring all pretrial matters in many civil cases to magistrate judges for determination of "all matters within the magistrate judge's dispositive jurisdiction").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

- o   *PMC v. Samsung*, 2:15-cv-01754-JRG-RSP, Dkt. 116, Order (E.D. Tex. Nov. 15, 2016) (overruling Samsung's objections to the court's claim construction opinion and order in *PMC v. Apple*, 2016 WL 6299860), Redmon Dec. Ex. 30; and

- o   *PMC v. Apple, Inc.*, 2016 WL 6247054, at \*25–28 (E.D. Tex. Oct. 25, 2016) (Payne, Mag. J.), Redmon Dec. Ex. 31.

- **"video" [7] and "video image" [8]:**

- o   *PMC v. Zynga, Inc.*, 2013 WL 4630447, at \*6–8 (E.D. Tex. Aug. 28, 2013) (Payne, Mag. J.) (referring also to the *PMC v. Echostar* claim construction order, *PMC v. Motorola, Inc.*, 2009 WL 1064334 (E.D. Tex. Sept. 30, 2009) (Everingham, Mag. J.)), Redmon Dec. Ex. 32.

- **"predetermined identifier" and "explains [a/said] significance"[9]:**

- o   *PMC v. Apple, Inc.*, 2016 WL 6299860 \*9–12, \*29–31, Redmon Dec. Ex. 29.

The Court has also addressed the patentability of the asserted '217 Patent, as well as related patents in PMC's patent family:

- *PMC v. Funai Elec. Co.*, 2017 WL 957719, at \*2 (Feb. 22, 2017) (recommending denial of § 101 challenge to the '217 Patent because "the ['217 Patent's] claims are directed to a specific improvement in modern technology and not to an abstract idea" as well as denying abstractness challenges to other PMC digital signal processing patents), Redmon Dec. Ex. 33, *adopted by* 2017 WL 951860 (Mar. 10, 2017) (Gilstrap, J.), Redmon Dec. Ex. 34;

- *PMC v. Samsung Elecs. Am., Inc.*, 2016 WL 9240544, at \*2–12 (Sept. 21, 2016) (Payne, Mag. J.) (recommending denial of §101 challenge to the '217 Patent and other digital signal processing patents) Redmon Dec. Ex. 35, *adopted by* 2016 WL 9274742 (E.D. Tex. Sept. 29, 2016) (Gilstrap, J.), Redmon Dec. Ex. 36; and

- *PMC v. Apple*, 2016 WL 5719701, at \*4–11 (E.D. Tex. Sept. 13, 2016) (Payne, Mag. J.) (recommending denial of § 101 challenge to other members of the PMC patent family), Redmon Dec. Ex. 37, *adopted by* 2016 WL 5475798 (E.D. Tex. Sept. 29, 2016) (Gilstrap, J.), Redmon Dec. Ex. 38.

---

[7] Claims 12, 18, and 21 of the '217 Patent; all asserted claims of the '344 Patent; claims 7 and 12 of the '920 Patent.

[8] Claim 20 of the '217 Patent (and dependents by implication); claim 36 of the '241 Patent.

[9] All asserted claims of the '217 Patent.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Finally, the Court has analyzed a license between PMC and Rovi Corporation (the "Rovi license"), which was litigated both in this Court and the Federal Circuit before the issue was resolved in arbitration and then confirmed by this Court. *PMC v. Motorola, Inc.*, 2:08-cv-00070-RSP, Dkt. 419 (Jan. 10, 2014) (Payne, Mag. J.) (Redmon Dec. Ex. 39), *adopted by* Dkt. 428 (Aug. 12, 2014) (Gilstrap, J.), *vacated and remanded sub nom. PMC v. Rovi Guides, Inc.*, 635 F. App'x 909 (Fed. Cir. 2015) (Redmon Dec. Ex. 40), *considered on remand sub nom. PMC v. Echostar Corp.*, 2016 WL 7665429 (E.D. Tex. June 29, 2016) (Payne, Mag. J.) (Redmon Dec. Ex. 41), *entering final judgment for PMC on arbitration award*, *Rovi Guides, Inc. v. PMC*, No. 2:08-cv-00070-RSP, Declaratory Relief Order and Final Judgment, Dkt. 583 (E.D. Tex. Nov. 22, 2017) (Payne, Mag. J.). This Court's familiarity with the Rovi license will become relevant if a dispute about the coverage of the Rovi license arises.

Netflix also argues that the court should not consider the copending cases, *PMC v. Google LLC*, 2:19-cv-00090-JRG and *PMC v. Akamai*, 2:19-cv-00089-JRG, in weighing judicial economy. Motion to Dismiss at 15. But there is no such bright-line rule. A court should not "weigh the judicial economy factor in a plaintiff's favor <u>solely</u> based on the existence of multiple co-pending suits[.]" *In re Google*, 2017 WL 977038, at *3 (Fed. Cir. 2017) (emphasis added). [10] A court may, however, consider it as a factor among others, so long as "the decision to decline transferring this case does not depend <u>solely</u> on the existence of multiple co-pending suits, but on the court's conclusion regarding all the public and private factors." *CXT Sys., Inc. v. Container Store, Inc.*, 2019 WL 1506015, at *4 (E.D. Tex. Apr. 5, 2019) (emphasis added). Here, the

---

[10] Netflix's distorts *GeoTag, Inc. v. Starbucks Corp*, 2013 WL 890484, at *6 (E.D. Tex. Jan. 14, 2013), eliding language showing that the court in that case avoided establishing a bright-line rule against considering co-pending cases: "Allowing a plaintiff to manufacture venue based on <u>this alone</u> would undermine the principals underpinning transfer law and the recently enacted America Invents Act." *Id.* at *6 (emphasis added).

23

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

consolidated defendants seek <u>different</u> transferee districts, where Netflix seeks the Northern District of California, Akamai seeks the District of Massachusetts, and Google has not filed a § 1404 motion. Denial of Akamai's and Netflix's motions to transfer would prevent duplicative and potentially conflicting adjudications. Together with the court's high degree of familiarity with PMC's patents, the co-pending suits heighten the judicial economy to be achieved by denying transfer.

> ## 2.   <u>The Remaining Private Factors Are Neutral or Weigh Against Transfer</u>
>
> ### i)    <u>Ease of Access to Sources of Proof Weighs Against Transfer</u>

As an initial matter, Netflix fails to identify with any specificity what evidence is available at its headquarters in California. Netflix flatly asserts that it maintains "[t]he bulk of [its] documents" and "potentially discoverable information" in Northern California. Motion to Dismiss at 13. That is not enough, because "[p]arties must specifically identify the relevant sources of proof (and why they are relevant), and specifically identify the physical location of those sources of proof. Without doing so, no court is able to make an informed inquiry into the true convenience of the parties." *Seven Networks, LLC v. Google (Seven Networks II)*, 2018 WL 4026760, at *4 (E.D. Tex. Aug. 15, 2018). ███████████████████████████████████████████████████ ██████████████████████████████████████████████ Netflix admits that its electronically stored information relevant to this case is accessible from anywhere, but says nothing about where those electronic documents are in fact stored. Motion to Dismiss at 13; *see also* Ex. 2 at 115:11–116:17; *Seven Networks II*, 2018 WL 4026760,. at *2 (rejecting consideration of records managed from the transferee district but that were stored elsewhere). Netflix failed to meet its burden to show that access to sources of proof weighs in favor of transfer.

PMC, however, keeps all of its corporate records in Texas. PMC stores copies of relevant patent licenses, settlement agreements, and documents relevant to the conception and reduction to

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

practice of the patents in suit, as well as other documents relevant to patent licensing negotiation, prosecution, and re-examination at its office in Sugar Land, Texas. King Dec. ¶ 5. PMC keeps other relevant documents and physical evidence in two locations in Houston. *Id.* ¶ 4, 6–7. First, PMC keeps original copies of many historical documents in a storage facility in Houston. *Id.* ¶ 6. Second, PMC's outside counsel currently stores the original prototype for PMC's technology at its Houston office, as well as certified copies of PMC patents. *Id.* ¶ 7.

The availability of evidence weighs against transfer because <u>all</u> of PMC's relevant evidence is located in Texas, whereas Netflix failed to identify any specific documents or evidence located in the Northern District of California.

ii)      <u>Cost of Attendance for Willing Witnesses Weighs Against Transfer</u>

Although Netflix purports in its Motion that a handful of its employees located in the Northern District of California will be relevant to this case, it <u>did not identify a single one of those witnesses</u> in its recently-served Initial Disclosures, demonstrating that those witnesses do not have any relevant knowledge and their convenience is irrelevant. *Compare* Motion to Dismiss at 13, *with* Redmon Dec. Ex. 46 (Netflix Initial Disclosures) at 4-7. Conversely, there are many relevant Texas witnesses that will be highly inconvenienced by travel to California.

At least five party witnesses are located in Texas. In its recently-served Initial Disclosures, PMC has identified two relevant Netflix witnesses in Texas: Brady Walsh, a Netflix Network Architect, and David Brown, a Senior Integration Engineer at Netflix, both in Austin, Texas. *See* Redmon Dec. Ex. 42 (PMC Initial Disclosures to Netflix) at 2-3; Ex. 43 (LinkedIn Profile for Brady Walsh); Ex. 44 (LinkedIn Profile for David Brown). And PMC's Timothy Dorney lives and works in Plano, in the Eastern District of Texas. King Dec. at ¶ 9; Ex. 42 at 3. Other relevant PMC witnesses are also located in Texas, far closer to this District than California. Mark King lives and works in Sugar Land, Texas, and Aaric Eisenstein lives and works in Austin, Texas. *See* Ex. 45

25

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

(Google Initial Disclosures) at 8; Ex. 46 at 3 ("Netflix incorporates by reference all persons identified by PMC and by other defendants in their Initial Disclosures."); King Dec. at ¶¶ 8, 10.

Although, in its Initial Disclosures, Netflix disclosed two of its employees who are located in California,[11] Netflix did not identify these employees in its opening brief, and any argument about these employees is therefore waived. *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 2959568, at *3 (E.D. Tex. 2019) ("[A]rguments raised for the first time in a reply brief are waived . . . ."). To the extent the Court does consider them, PMC offers to preserve their testimony through video deposition, mitigating any inconvenience. *See WEB Telephony, LLC v. Comcast Corp.*, 2010 WL 3860305, at *4 ("[T]o the extent that any party wishes to call a witness who is substantially inconvenienced by the trial location, the availability of videotaped depositions mitigates the cost and potential prejudice associated with that inconvenience.").

Moreover, there are <u>many</u> more disclosed PMC witnesses that would be far more inconvenienced by trial in California than in this District. Putting aside the Texas witnesses discussed above, PMC has nine witnesses whose travel time will approximately double if Netflix's motion is granted. *See Volkswagen I*, 371 F.3d at 204–05 ("[T]he factor of inconvenience increases in direct relationship to the additional distance to be traveled."). Five live in the greater New York City area: John Harvey, Mary "Kazie" Metzger, James Cuddihy, Stephen McCandless, and Robert Caird. King Dec. ¶¶ 11, 12, 16-18;  ; Ex. 45 at 8–9. New York City is approximately 1,255 miles from Marshall, but 2,569 miles from San Francisco—over 1,300 miles further from the transferee district. Boyd Lemna and Bill Farmilo, who both live in Ottawa, Ontario, King Dec. ¶¶ 14, 15; Ex. 45 at 9, 11, would also be greatly inconienced by trial in the Northern District of California, which

---

[11] Netflix also identified unnamed "Netflix Engineers and/or Engineering Managers" in its initial disclosures, Ex. 46 at 7, which should be afforded little weight. *See Stragent, LLC v. Pioneer Elecs (USA) Inc.*, 2013 WL 8467476, at *6 (E.D. Tex. 2013).

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

is almost twice the distance as to Marshall. The same is true for Thomas Scott and Kitty Harvey, who live in Great Falls, Virginia, and Washington, D.C., respectively. King Dec. ¶¶ 13, 19; Ex. 45 at 9, 12. The transfer Netflix seeks would "merely serve[] to shift inconveniences from one party to the other" and is therefore "inappropriate." *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1083 (Fed. Cir. 1989); *See CXT Sys., Inc. v. Container Store, Inc.*, 2019 WL 1506015, at *4 (E.D. Tex. Apr. 5, 2019) (Payne, Mag. J.) (defendant "narrowly focuses its argument on the cost of attendance for its [transferee district] employees, while ignoring the relative cost of attendance for all other witnesses in other states" effectively "call[ing] for reassignment of inconvenience from certain witnesses to other witnesses").

To the extent Netflix attempts in its reply to rely on the California prior artists identified in its Initial Disclosures, Ex. 46 at 4–5, that argument is waived. *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 2959568, at *3. Moreover, Netflix appears to have cherry-picked only California "prior artists," fails to specify how these purported "prior artists" have any relevance, and goes so far as to identify a deceased prior art witness. *Compare* Ex. 46 at 5 (identifying Martin M. Atalla of Atherton, California), *with* Ex. 47 (National Inventors Hall of Fame Inductee Webpage for Martin M. Atalla, formerly of Atherton, California, who died almost ten years ago). Indeed, Google—who has not moved to transfer under § 1404—identifies prior artists from all over the country, including two from Texas. *See* Ex. 45 at 13–14; *see also* Ex. 46 at at 3 ("Netflix incorporates by reference all persons identified by PMC and by other defendants in their Initial Disclosures.").

        iii)      The Northern District of California Does Not Enjoy Greater Subpoena Power

Netflix mischaracterizes current law as to the importance of subpoena power, citing cases that predate the 2013 amendment to Rule 45 providing for nationwide service of subpoenas. *Compare* Fed. R. Civ. P. 45, *with U.S. Ethernet Innovations, LLC v. Samsung Elecs. Co.*, 2013

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

WL 1363613, at *3 (E.D. Tex. Apr. 2, 2013); *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). "Generally, the overall effect of the amendment to Rule 45 giving the Court power to issue nationwide service of subpoenas lessens the likelihood that this factor will be determinative in the analysis." *Mass Engineered Design, Inc. v. SpaceCo Bus. Solutions, Inc.*, 2016 WL 6824415, at *3 (E.D. Tex. Mar. 28, 2016). And "[t]he proffering party now has the option to depose the non-party witness near that witness's residence or regular place of business, and later present the witness's deposition testimony at trial without the involvement of a second district court." *ACQUIS LLC v. EMC Corp.*, 67 F. Supp. 3d 769, 777 (E.D. Tex. 2014).

Netflix cites two of PMC's licensees that are based in California as relevant to subpoena power. Motion to Dismiss at 14. But <u>this</u> Court has subpoena power over Texas third-party prior art witnesses, John G. Campbell, in Iriving, Texas, and Richard M. Fogle, in Beford, Texas. Ex. 45 at 14; *see also* Ex. 46 at at 3. And neither this Court nor the Northern District of California have absolute subpoena power over other third-party witnesses identified from all over the country, such as prosecution counsel, former employees of PMC, and other licensees of PMC. *See* Ex. 46 at 5–6; Ex. 45 at 12–14. Netflix not only "failed to explain how [it] would be inconvenienced by presenting only the non-party witnesses' deposition testimony at trial," Netflix "failed to even recognize the possibility of presenting these witnesses' testimony by deposition." *See VirtualAgility, Inc. v. Salesforce.com, Inc.*, 2014 WL 459719, at *4–5 (E.D. Tex. Jan. 31, 2014) (Gilstrap, J.). This factor is "essentially neutral." *See id.* at 5.

> iv)    <u>Time to Trial in This Court for Patent Cases Is Significantly Faster Than in the Northern District of California</u>

In considering administrative difficulties from court congestion, the relevant inquiry is "the speed with which a case can come to trial and be resolved." *In re Genentech*, 566 F.3d at 1347. Courts in this District have also considered time to trial specific to patent cases. *Gemalto, S.A. v. HTC Corp.*, 2011 U.S. Dist. LEXIS 133612, at *23 (E.D. Tex. Nov. 18, 2011) (considering

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

statistics showing "that the time from the filing of a patent case to termination by a jury verdict is faster in the Eastern District of Texas"). In the Northern District of California, the average time to trial for a patent case is 2.7 years; this Court averages 2.2 years for patent cases. *See* Redmon Dec. Ex. 48 (PWC 2018 Patent Litigation Study) at 14. In addition, were this case to be transferred, the time to trial would be essentially reset: "[I]t is the Court's sense of things that a transferred case essentially starts over in the transferee district and the time spent in the originating district is substantially lost as regards time to trial, since the transferred case is unavoidably back in that court's existing queue of current trial settings." *Uniloc USA, Inc. v. Samsung Elecs. Am.*, 2018 U.S. Dist. LEXIS 176337, at *21 (E.D. Tex. Sept. 18, 2018). Where PMC currently has a trial date in this Court of September 14, 2020, Dkt. No. 77 at 1, and the parties could not expect a trial in California for almost three years from the date of transfer, this factor weighs against transfer.

v)   <u>The Local Interest in this Case Is Neutral</u>

While Netflix has its headquarters in the Northern District of California, PMC is organized in Texas, based in Sugar Land, Texas, and has a witness who lives in the District. King Decl. ¶¶ 3, 9. Texas citizens have an interest in deciding the facts relating to the enforcement of the patents of a Texas LLC with its principal place of business in Texas. *See Personal Audio, LLC v. Apple, Inc.*, 2010 WL 582540, at *6 (E.D. Tex. Feb. 11, 2010). Netflix's suggestion that the Northern District of California has stronger interest because of the number of Netflix employees located there, Motion to Dismiss at 15, is wrong. *See AGIS Software Dev. LLC v. Apple, Inc.*, 2018 WL 2721826, at *8 (E.D. Tex. 2018) (Gilstrap, J.) ("If followed to its conclusion, smaller businesses and individual plaintiffs will *always* be disfavored by this factor, as the interest their communities have is small when compared to the interest a distant community may have in its hometown corporate pillar."). Because both Texas and California have competing interests, this factor is neutral.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## II.    CONCLUSION

For the reasons stated above, PMC respectfully requests the Court deny Netflix's motion to dismiss or transfer.

Dated: August 16, 2019                                      Respectfully submitted,

By: *Joseph S. Grinstein*


Arun Subramanian
New York Bar No. 4611869
Tamar Lusztig
New York Bar No. 5125174
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019-6023
Telephone: (212) 471-8346
asubramanian@susmangodfrey.com
tlusztig@susmangodfrey.com

Joseph S. Grinstein
Texas Bar No. 24002188
J. Patrick Redmon
Texas Bar No. 24110258
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 653-7820
jgrinstein@susmangodfrey.com
predmon@susmangodfrey.com

S. Calvin Capshaw
Texas Bar No. 03783900
CAPSHAW DERIEUX LLP
114 E. Commerce Avenue
Gladewater, TX 75647
Telephone: (903) 233-4826
ccapshaw@capshawlaw.com

Dmitry Kheyfits
KHEYFITS BELENKY LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 429-1739
dkheyfits@kblit.com

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Andrey Belenky
KHEYFITS BELENKY LLP
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
Email: abelenky@kblit.com

*Attorneys for Personalized Media
Communications, LLC*

### Certificate of Service

I certify that on August 16, 2019, I served the foregoing on all counsel of record via secure file transfer.

*/s/ J. Patrick Redmon*
J. Patrick Redmon

### Certificate of Authorization to File Under Seal

I hereby certify that this document is being filed under seal pursuant to the Court's authorization in the Protective Order entered in this matter.

*/s/ J. Patrick Redmon*
J. Patrick Redmon