**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC<br><br>Plaintiff,<br><br>v. | |
| GOOGLE LLC. | Case No. 2:19-cv-90-JRG<br>LEAD CASE |
| NETFLIX, INC.<br><br>Defendants. | Case No. 2:19-cv-91-JRG |

**PLAINTIFF PERSONALIZED MEDIA COMMUNICATIONS LLC'S**
**SUPPLEMENTAL BRIEF ADDRESSING VENUE FOR DEFENDANT NETFLIX**

## TABLE OF CONTENTS

A.    Background ........................................................................................................... 1

B.    Netflix's ISP Agents Conduct Its Business from the Eastern District of Texas ................. 3

C.    In the Alternative, PMC Respectfully Requests Transfer to the Southern District
      of New York ..................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*,
  643 F. Supp. 2d 883 (S.D. Tex. 2008) ......................................................................9

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017)..............................................................1, 2, 3, 4

*In re Google LLC*,
  ___ F.3d ___, No. 2019-126, 2020 WL 728165 (Fed. Cir. Feb. 13, 2020) ..................... *passim*

*Pac. Gas & Elec. Co. v. United States*,
  838 F.3d 1341 (Fed. Cir. 2016)...............................................................................9

*Rembrandt Wireless Techs., LP v. Apple Inc.*,
  No. 2:19-CV-00025-JRG, 2019 WL 6344470 (E.D. Tex. Nov. 27, 2019)............................11

*Seven Networks, LLC v. Google LLC*,
  315 F. Supp. 3d 933 (E.D. Tex. 2018) ..........................................................1, 2, 5

**Statutes**

28 U.S.C. § 1400(b) ......................................................................................1, 4, 5

28 U.S.C. § 1404(a) .........................................................................................2, 10

28 U.S.C. § 1694.................................................................................................5

America Invents Act, Pub. L. 112-29, § 18(c)....................................................5

**Other Authorities**

Fed. R. Civ. Proc. 4...........................................................................................5

Restatement (Third) of Agency .........................................................................9

Tex. R. Civ. P. 106(b)........................................................................................5

Pursuant to the Court's order (Dkt. No. 156), PMC submits this brief addressing the impact of the Federal Circuit's recent decision in *In re Google LLC*, ___ F.3d ___, No. 2019-126, 2020 WL 728165 (Fed. Cir. Feb. 13, 2020) ("*SIT*"), on whether venue is proper in this District for Defendant Netflix.

### A. **Background**

Venue is proper in any judicial district where the defendant (1) has committed acts of infringement; and (2) has a regular and established place of business. 28 U.S.C. § 1400(b). *In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017), established three "general requirements to establishing that the defendant has a regular and established place of business." *SIT*, 2020 WL 728165, at *3. First, "there must be a physical place in the district;" second, "it must be a regular and established place of business;" and third, "it must be the place of the defendant." *Id.* (quoting *Cray*, 871 F.3d at 1360). In *Seven Networks, LLC v. Google LLC*, this Court held that Google's installed GGC servers in the Eastern District of Texas were a physical place satisfying the first requirement of the *Cray* test: "[t]he 'place' is specifically localized: a physical server occupying a physical space" and the servers are therefore "more than merely a virtual space or electronic communications from one person to another." 315 F. Supp. 3d 933, 951 (E.D. Tex. 2018) (internal quotation marks and alterations omitted) (citing *Cray*, 871 F.3d at 1362). This Court also found that "the control [Google] exerted over both the server[s] and [their] location under the GGC agreements" made them Google's regular and established places of business, satisfying the second and third requirements of the *Cray* test. *Id.* at 956.

The same GGC server facts were presented to the Federal Circuit in Google's petition for mandamus in *SIT*. In its decision granting mandamus, the Federal Circuit held that a "place of business" need not require "real property ownership or a leasehold interest in real property." *SIT*,

1

2020 WL 728165, at *4. Indeed, the Federal Circuit agreed with this Court and found that "leased shelf space or rack space can serve as a 'place' under the statute," and where Google's "GGC servers are physically located in the district in a fixed, geographic location," they satisfied the first *Cray* requirement. *Id.* With respect to the second *Cray* requirement, the Federal Circuit announced a new rule, holding "a 'place of business' generally requires an employee or agent of the defendant to be conducting business at that place." *Id.* The agent or employee must be "conducting business," so activities "such as maintenance, that are merely connected to, but do not themselves constitute, the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services," will not suffice. *Id.* at *7. Nonetheless, the Federal Circuit noted that the requisite "agent or employee" need not necessarily be "a human agent," and it is possible—under circumstances that the court did not describe—for "a machine [to] be an 'agent.'" *Id.* at *8.

After this Court ruled in *Seven Networks*, but before the Federal Circuit's *SIT* decision last week, Netflix moved to dismiss PMC's complaint for improper venue or in the alternative to transfer the case to the Northern District of California for convenience pursuant to 28 U.S.C. § 1404(a). PMC opposed the motion, arguing that Netflix committed acts of infringement in the Eastern District of Texas by serving video content through its Open Connect Appliances ("OCAs"), located at ISP facilities in the district. PMC also argued that Netflix's local OCAs are Netflix's regular and established place of business, and that the Northern District of California is substantially less convenient than the Eastern District of Texas.

Last week, the Court requested the Parties supplement their venue briefing in order to take up certain issues raised by the Federal Circuit's ruling, which PMC does below. For the reasons described, Netflix plainly has a regular and established place of business in this district.

2

### B.  <u>Netflix's ISP Agents Conduct Its Business from the Eastern District of Texas</u>

As now confirmed by the Federal Circuit, Netflix's OCAs— ███████████████

████████████████████████████—meet the first *Cray* requirement. *See SIT*, 2020 WL

728165, at *4 ("[L]eased shelf space or rack space can serve as a 'place' under the statute[.]"); *see*

*also* Dkt. No. 89, Ex. 2 at 74:18-22 (███████████████████████████

████████████████████████████████████████████████

████████████████████████████). These locations in the district are also "of"

Netflix, satisfying the third *Cray* requirement, because Netflix exercises "attributes of possession

or control" over its OCA locations in the district. *Cray*, 871 F.3d at 1363. As explained in detail

in PMC's prior briefing, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

Netflix previously claimed that it retained no control whatsoever over its OCAs in the

district because ████████████████████████████████████████

████████████████████████████████ But, as explained in PMC's prior briefing on this

issue, ████████████████████████████████████████████

████████████████████████████████████████████████

███████████ *See* Dkt. No. 89 at 1-4. Moreover, Netflix holds out the OCAs in the district as

its own in, for example, marketing materials that appear on its website and depict Eastern District

of Texas OCAs on a map of the United States that is described as a "map of our network." *See*

Dkt. No. 89 at 15-16,   Ex. 18; *see also Cray*, 871 F.3d at 1363 (noting that "a defendant's representations that it has a place of business in the district[,]" by a defendant's "list[ing] the alleged place of business on a website[,]" or a defendant's "[m]arketing or advertisements" which "indicate that the defendant itself holds out [the] place for its business" are highly relevant).

Accordingly, that leaves only the second *Cray* factor. PMC previously argued that because

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Netflix's business in the Eastern District of Texas is regular and established. *See* Dkt. No. 89 at 13-14. But in *SIT*, the Federal Circuit established an additional requirement under the second *Cray* factor— namely, "an employee or agent of the defendant" that is "conducting business" "regularly" at the place. 2020 WL 728165, at *7.

Although the Federal Circuit found that Google's two ISP partners in the Eastern District of Texas were not Google's agents based on the record before it, it did not hold that ISPs operating installed equipment may <u>never</u> be agents for venue purposes under 28 U.S.C. § 1400(b). The Federal Circuit examined the relevant contracts to assess three categories of activities Google's ISP partners agreed to perform, and found each insufficient. First, the ISPs in *SIT* provided "the GGC servers with network access, *i.e.*, a connection to the ISP's customers, as well as the public Internet." *Id.* at *6. The court found those actions insufficient for agency because "Google has no right of interim control over the ISP's provision of network access beyond requiring that the ISP maintain network access to the GGC servers and allow the GGC servers to use certain ports for inbound and outbound network traffic." *Id.* Second, the ISPs in *SIT* performed "installation of the GGC servers." *Id.* Although this "may be suggestive of an agency relationship," the Federal Circuit reasoned that because "it is a one-time event for each server," the installation was not sufficiently

4

"regular" to meet the statutory requirements. *Id.* Third, the ISPs in *SIT* performed "maintenance" on the OCAs, but the Federal Circuit found that "maintenance activities cannot, <u>standing alone</u>, be considered the conduct of Google's business." *Id.* at *6-7 (emphasis added). The Federal Circuit contrasted this limited activity with an agent who is involved in "the actual producing, storing, and furnishing to customers of what the business offers." *Id.* at *7. Based on the record to date, there is a sound basis for holding that ISPs act as Netflix's agents.

Netflix's business is a "subscription streaming entertainment service." Ex. 1 at 1 (Netflix 2019 Form 10-K, "About Us"). Netflix OCAs are "responsible for delivering Netflix TV shows and movies to our members world-wide." Dkt. No. 89, Ex. 1 at 1. The OCAs "store encoded video/image files and serve these files via HTTP/HTTPS to client devices." *Id.* at 3.[1]

---

[1] OCAs may also be Netflix's agents in their own right. *SIT* suggests that a <u>machine</u> might act as an "agent" conducting the defendant's business. *See* 2020 WL 728165, at *8. Much like the ATM machines discussed in this Court's decision in *Seven Networks*, which the Federal Circuit expressly reserved in its analysis, *see id.*, OCAs plainly "conduct" Netflix's business of streaming entertainment to customers in the district under the full control and oversight of Netflix. Congress has never distinguished between automated methods of conducting business and business conducted by humans, and in enacting the AIA, Congress <u>assumed</u> that the patent venue statute did cover machine-conducted business. *See* America Invents Act, Pub. L. 112-29, § 18(c) (specifically exempting ATMs from § 1400(b)). The Federal Circuit in its decision also focused on the issue of service under 28 U.S.C. § 1694, reasoning that service should be possible under that statute where venue is appropriate under § 1400(b). *See* 2020 WL 728165, at *8. Any such requirement would be satisfied with respect to OCAs by following Rule 4 of the Federal Rules of Civil Procedure, which refers to state law for permissible methods for service. Under the Texas Rules of Civil Procedure, courts may authorize leaving a summons with an employee at an ISP location hosting an OCA, or following *any other method* for effecting service that the court considers reasonable. Tex. R. Civ. P. 106(b).

But that isn't all.

The Netflix Deployment Guide even requires ISP partners to "identify a person or a set of people who are available to perform" specific business roles for Netflix at the ISP facility to "facilitate the overall process" of delivering streaming video to Netflix customers:

## Team roles

To participate in the program, you will need to identify a person or a set of people who are available to perform the following roles. Your team members will work closely with the corresponding members of the Netflix team to facilitate the overall process.

| Partner role | Description | Corresponding Netflix role(s) |
|---|---|---|
| Engagement manager | Serves as the main point of contact for the Netflix Open Connect partner engagement manager (PEM) | Netflix Open Connect Partner Engagement Manager (PEM) |
| Legal representative | Reviews and accepts the legal agreements that are required for OCA deployments | PEM, Open Connect legal representative, Open Connect business operations |
| Network engineer | Provides information about partner sites, OCA configurations, maintenance, and network routing | PEM, Open Connect Operations |
| Logistics representative | Directs the shipment of OCAs<br><br>Your logistics representative should be involved at the beginning of the engagement process to avoid shipping delays at later stages of the process. | PEM, Open Connect Logistics, Open Connect Operations |
| Data center operations | Installs OCAs on the partner network | Open Connect Operations |
| Network operations | Works with Netflix to troubleshoot routing and other configuration issues that might arise | Open Connect Network Engineering, Open Connect Operations |

Dkt. No. 62-12 at 5-6. If Netflix employees fulfilling these roles were working out of the Suddenlink facility in the Eastern District of Texas, there would be no question that Netflix was operating a regular and established place of business there. There should be no difference simply because Netflix requires Suddenlink employees to do these jobs on Netflix's behalf.

In addition, Netflix advises its ISP partners that the "ideal" configuration for delivering streaming entertainment is a combination of OCAs and "peering." Netflix's peering policy requires ISPs to "provide a 24/7 contact who can escalate critical issues in a timely fashion." Ex. 5 at 1. ISPs are also expected to "make good faith efforts to keep [route] information up-to-date" in a public Internet Routing Registry database, *see id.*, which likewise requires dedicated support from the ISP partner and its employees.

Netflix's ISP partners do far more than "basic maintenance." On the contrary, <u>the ISPs help Netflix operate the OCAs</u> and the manner in which they deliver streaming video to Netflix clients. For example, the Deployment Guide explains that "the manner in which traffic is directed to the appliance is <u>determined explicitly by you [i.e., the ISP] and Netflix</u>, not by the appliance itself." Dkt. No. 62-12 at 13 (emphasis added). Similarly, an "OCA only serves clients at IP addresses that <u>you</u> [i.e., the ISP] advertise to the OCA via a BGP session. In other words, traffic is only delivered from your embedded OCAs to the customer prefixes that you explicitly announce to them . . . ." *Id.* (emphasis added). Unlike the installation activities that *SIT* held were "one-time event[s]" that "do[] not constitute the conduct of a 'regular and established' business," *SIT*, 2020 WL 728165, at *6, the BGP sessions configured by the ISPs are required for the OCAs to function, *see* Dkt. 62-12 at 17 ("As an implicit requirement, **all** appliances must have a BGP session configured in order to correctly participate in Netflix content steering and delivery."); *id.* (explaining that the routes advertised to OCAs via BGP sessions "are synchronized . . . approximately every five minutes"). ISPs may also "[r]econfigure the IP address of an OCA," as well as configure router interfaces to serve Netflix traffic. *See id.* at 14-16. ISPs can "monitor their own embedded OCAs' status and performance," Dkt. 89, Ex. 1 at 6, and may be asked (by Netflix) to assist in resolving software updates, *see* Ex. 2. In short, under Netflix's direction, ISPs "furnish[ ]" streaming entertainment to

Netflix customers. *SIT*, 2020 WL 728165, at \*7. That is not "ancillary to" Netflix's business—that <u>is</u> Netflix's business. *Id.*

 To the extent Netflix argues its ISP agreements disclaim an agency relationship, "it is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship." *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016). Netflix may also argue that its ISP partners merely perform services for Netflix, rather than act as its agents, but "[p]eople often retain agents to perform specific services." Restatement (Third) of Agency § 1.01 cmt. c ("Restatement"). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* § 1.01 cmt. f; *see also SIT*, 2020 WL 728165, at \*6 (citing the Restatement for the requirement that a principal have the "right of interim control"); *Pac. Gas*, 838 F.3d at 1360 (noting that the principal has "the right to give interim instructions or directions to the agent once their relationship is established" (citing the Restatement)); *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 888 (S.D. Tex. 2008) ("There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."). Here, Netflix's ISP partners are hardly "free to do the work" in their "own way." ██████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████.

 Finally, the Restatement observes that "a relationship of agency always 'contemplates three parties—the principal, the agent, and the third party with whom the agent is to deal.'" Restatement § 1.01 cmt. c. In contrast, a service provider might "simply furnish advice" without "interact[ing] with third parties as the representative of [its client]." *Id.* Here, Netflix's ISP partners (the agent) "deal" with Netflix's customers (the third party) on behalf of Netflix (the principal).

There is enough in the record to establish that Netflix's ISP partners are its agents for the purposes of patent venue and deny Netflix's motion to dismiss outright, but at the very least—where the Federal Circuit established a new requirement last week for which PMC did not have an opportunity to seek discovery—the Court should permit PMC to take further discovery on, for example, the nature and frequency of Netflix's communications with its Eastern District of Texas ISP partners, and the nature and frequency of Netflix's "interim instructions," whether in the form of updates to its Deployment Guide or by other means. █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

## C.  In the Alternative, PMC Respectfully Requests Transfer to the Southern District of New York

In the alternative, to the extent the Court determines venue is not proper in the Eastern District of Texas, PMC respectfully requests the Court transfer this case to the Southern District of New York instead of the Northern District of California, as Netflix has requested. On a motion under 28 U.S.C. § 1404(a), the Court may transfer this case "to any other district or division where it might have been brought." There can be no dispute that PMC's case could have been brought in the Southern District of New York, where Netflix maintains an established office, *see* Ex. 3, in addition to committing acts of infringement through its OCAs located in New York, *see* Dkt. No. 89, Ex. 18.

---

[2] The Court should further permit PMC to take discovery on the nature and frequency of Netflix's interactions with the OCAs, which may show that the OCAs themselves act as Netflix's agents. *See SIT*, 2020 WL 728165, at *8 ("To be clear, we do not hold today that a 'regular and established place of business' will always require the regular presence of a human agent, that is, whether a machine could be an 'agent.').

For the reasons explained in PMC's prior briefing, California is extremely inconvenient for PMC and its witnesses. Many of PMC's witnesses are located in Texas, but several live in New York, including both inventors of the asserted patents, as well as PMC's President and CEO. *See* Dkt. No. 89-1 ¶¶ 8-19 (King declaration). Moreover, there are many third-party witnesses located in New York (or elsewhere on the East Coast) that have been identified in the Parties' initial disclosures. *See* Dkt. No. 89, Ex. 45 (Google's initial disclosures identifying three East Coast-based prosecution counsel witnesses, and five New York-based prior artists); *id.*, Ex. 46 at 3 (Netflix's initial disclosures, incorporating by reference Google's initial disclosures). Netflix could hardly claim to be inconvenienced by trial in New York, where it has a large office. Conversely, PMC has no contacts whatsoever with California. Where "plaintiff's choice of venue is to be respected," in the event the Court decides to transfer this case, PMC respectfully requests it transfer the case to the Southern District of New York. *Rembrandt Wireless Techs., LP v. Apple Inc.*, No. 2:19-CV-00025-JRG, 2019 WL 6344470, at *2 (E.D. Tex. Nov. 27, 2019).

Dated: February 20, 2020

Respectfully submitted,

By: _Joseph S. Grinstein_

Arun Subramanian
New York Bar No. 4611869
Tamar Lusztig
New York Bar No. 5125174
Geng Chen
New York Bar No. 5377262
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019-6023
Telephone: (212) 471-8346
asubramanian@susmangodfrey.com
tlusztig@susmangodfrey.com
gchen@susmangodfrey.com

Joseph S. Grinstein
Texas Bar No. 24002188
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 653-7820
jgrinstein@susmangodfrey.com

S. Calvin Capshaw
Texas Bar No. 03783900
CAPSHAW DERIEUX LLP
114 E. Commerce Avenue
Gladewater, TX 75647
Telephone: (903) 845-5770
ccapshaw@capshawlaw.com

Dmitry Kheyfits
New York Bar No. 4743795
KHEYFITS P.C.
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
dkheyfits@kheyfits.com

*Attorneys for Personalized Media
Communications, LLC*

**<u>Certificate of Service</u>**

I certify that on February 20, 2020, I electronically served the foregoing on all counsel of record through the Court's ECF system.

*/s/ Tamar Lusztig*
Tamar Lusztig

**<u>Certificate of Authorization to File Under Seal</u>**

I hereby certify that this document is being filed under seal pursuant to the Court's authorization in the Protective Order entered in this matter.

*/s/ Tamar Lusztig*
Tamar Lusztig
