**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC<br><br>Plaintiff,<br><br>v. | |
| GOOGLE LLC. | Case No. 2:19-cv-90-JRG<br>LEAD CASE |
| NETFLIX, INC.<br><br>Defendants. | Case No. 2:19-cv-91-JRG |

**PLAINTIFF PERSONALIZED MEDIA COMMUNICATIONS LLC'S
<u>SUPPLEMENTAL BRIEF ADDRESSING VENUE FOR DEFENDANT GOOGLE</u>**

## **Table of Contents**

A.    Google's Employees and Agents Conduct Its Business from ██████████ ....................... 2

B.    Google's ████████████ Further Supports Venue in this District................................ 9

C.    *SIT* Does Not Foreclose GGC Servers as a Basis for Venue................................................. 10

D.    Google's Contacts Taken Together Plainly Establish Venue................................................ 15

E.    Additional Discovery Is Warranted ...................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) ................................................................5

*Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*,
  643 F. Supp. 2d 883 (S.D. Tex. 2008) ................................................6, 7

*Christiana Tr. v. Riddle*,
  911 F.3d 799 (5th Cir. 2018) ....................................................................4

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017)......................................................... *passim*

*Desai v. ADT Security Systems, Inc.*,
  78 F. Supp. 3d 896, 903 (N.D. Ill. 2015). ..........................................6, 7, 8

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
  843 F.3d 958 (D.C. Cir. 2016) ..................................................................5

*In re Google LLC*,
  ___ F.3d ___, No. 2019-126, 2020 WL 728165 (Fed. Cir. Feb. 13, 2020) ..................... *passim*

*In re Google LLC*
  (Fed. Cir. Nov. 18, 2019)........................................................................11

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013)..................................................................................5

*Khodeir v. Sayyed*,
  348 F. Supp. 3d 330 (S.D.N.Y. 2018)........................................................7

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) ..................................................................5

*Pac. Gas & Elec. Co. v. United States*,
  838 F.3d 1341 (Fed. Cir. 2016)..............................................................4, 6

*Salyers v. Metro. Life Ins. Co.*,
  871 F.3d 934 (9th Cir. 2017) ....................................................................4

*Seven Networks, LLC v. Google LLC*,
  315 F. Supp. 3d 933 (E.D. Tex. 2018)................................................. *passim*

*Smith v. State Farm Mut. Auto. Ins. Co.*,
  30 F. Supp. 3d 765 (N.D. Ill. 2014) ...................................................................7

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012).................................................................................5

*State Farm Mut. Auto. Ins. Co. v. Bockhorst*,
  453 F.2d 533 (10th Cir. 1972) ..........................................................................13

*Uniloc USA, Inc. v. Apple Inc.*,
  No. 2:17-CV-00258-JRG, 2017 WL 3382806 (E.D. Tex. July 21, 2017)............15

**Statutes**

28 U.S.C. § 1694................................................................................................14

56 Bus. Law. 341, 354 (2000) ............................................................................13

America Invents Act, Pub. L. 112-29, § 18(c)......................................................12

Unif. Computer Info. Transactions Act § 107 cmt. 5 (2002)...............................13

Unif. Electronic Transactions Act § 2 (1999) .....................................................13

**Other Authorities**

*Emerging Law* ...................................................................................................13

Fed. R. Civ. P. 4 ................................................................................................14

Restatement (Third) of Agency ............................................................................4

Tex. R. Civ. P. 106.............................................................................................14

Pursuant to the Court's order (Dkt. No. 156), PMC submits this brief addressing the impact of the Federal Circuit's recent decision in *In re Google LLC*, ___ F.3d ___, No. 2019-126, 2020 WL 728165 (Fed. Cir. Feb. 13, 2020) ("*SIT*"), on venue as to Defendant Google.

In its prior briefs, PMC argued Google had  Google Global Cache ("GGC") servers, which were sufficient for venue as ████████████████████████████████████████, *see id.* at 22-24.

In *SIT*, the Federal Circuit held that a "place of business" need not require real property ownership or a leasehold interest in real property. Indeed, the Federal Circuit agreed with this Court and found that "leased shelf space or rack space can serve as a 'place' under the statute," and where Google's "GGC servers are physically located in the district in a fixed, geographic location," they satisfied the first *Cray* requirement ("place"). *SIT*, 2020 WL 728165, at *4; *see also In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017). With respect to the second *Cray* requirement ("regular and established place of business"), the Federal Circuit announced a new rule, holding "a 'place of business' generally requires an employee or agent of the defendant to be conducting business at that place." *Id.* Nonetheless, the Federal Circuit noted that the requisite "agent or employee" need not necessarily be "a human agent," and the court did not foreclose the possibility for "a machine [to] be an 'agent.'" *Id.* at *8. In his concurring opinion, Judge Wallach reasoned that "Google's end users" in the Eastern District of Texas may "become agents of Google in furtherance of its business" by "continuously providing data which Google monetizes as the

1

correct aspect of its business model," and suggested the District Courts consider this question. *Id.* at * 8 (Wallach, J., concurring).

Last week, the Court requested the Parties supplement their venue briefing in order to take up certain issues raised by the Federal Circuit's ruling, which PMC does below. For the reasons described, Google plainly has a regular and established place of business in this district.

### A.  Google's Employees and Agents Conduct Its Business from █████████████

Google maintains a regular and established place of business in this district in ███████ ██████████. Google uses ████████████████████████████████ ██████████████████████████████. *See* Dkt. No. 88 at 18-21; Dkt. No. 106 at 6-7. The Federal Circuit's *SIT* decision <u>bolsters</u> the conclusion that ███████████████ is Google's regular and established place of business within the meaning of the venue statute.

Google's ███████████████ easily meets the first *Cray* factor: ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 958 (E.D. Tex. 2018); *see also SIT*, 2020 WL 728165, at *7 (defining "conduct of business" to include "production, <u>storage</u>, transport, and exchange of <u>goods or services</u>" (emphases added)). Similarly, █████████████████████ is straightforwardly "of Google," meeting the third *Cray* factor. ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

2

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

With respect to the second *Cray* factor, PMC previously relied on the fact that ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████. *See* Dkt. No. 88 at 20. But last week, the Federal Circuit held that the regular

presence of the defendant's employees or agents, conducting the defendant's business, is

dispositive for the second *Cray* factor. Because of the following extensive and regular activities of

Google's employees and agents at ██████████████, the Court should deny Google's

motion on the basis of its regular and established place of business in ██████████.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

3



The Federal Circuit requires the employee visits to be "regular," leaving it up to this Court to determine, based on the nature of the visits and their frequency, whether that requirement has been met.

"An agency relationship is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.'" *SIT*, 2020 WL 728165, at *6 (quoting Restatement (Third) § 1.01 ("Restatement")).[1] "[A]n independent contractor can be an agent[,]" an "agent can serve multiple

---

[1] "To determine whether an agency relationship exists," federal courts have generally made their own common law, looking "to the Restatement of Agency." *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016) ("The key to the existence of an agency relationship . . . is set forth in section 1.01 of the Restatement of Agency."); *see, e.g., Christiana Tr. v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018); *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017);

principals at once[,]" and "one can be an agent of a principal without having authority to bind the principal to a contract with a third party." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250–51 (10th Cir. 2013) (citing cases and the Restatement).

The *sine qua non* of agency is "the principal's right to control the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quoting Restatement § 1.01 cmt. f); *see also Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1055 (9th Cir. 2017) ("Whether an agency relationship exists also depends on the level of control a principal exerts over the agent.").



*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 970 (D.C. Cir. 2016); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 56 (1st Cir. 2012).

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ "it is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship." *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016); *see also* Restatement § 1.02 cmt. b (noting that the presence of statements disclaiming agency "in an agreement is not determinative and does not preclude the relevance of other indicia of consent"). ████████████████████████████████

████████████████████ "[p]eople often retain agents to perform specific services." Restatement § 1.01 cmt. c. "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* § 1.01 cmt. f; *see also SIT*, 2020 WL 728165, at *6 (citing the Restatement for the requirement that a principal have the "right of interim control"); *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 888 (S.D. Tex. 2008) ("There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."). For example, in *Desai v. ADT Security Systems, Inc.*, "EG contracted with PMG to promote a specific list of ADT's home security services subject to detailed restrictions on [PMG's] telemarketing." 78 F.

██████████████████████████████████████████████████████████████

Supp. 3d 896, 903 (N.D. Ill. 2015). EG retained the contractual right to control PMG's services even after the relationship was established, including "what products and services" PMG would promote, which "techniques" PMG was able to use to perform its services, and "what information PMG was required to provide to ensure compliance with the contract." *Id.* Because "[t]hese 'interim instructions' from EG to PMG are the hallmark of a principal-agent relationship," the court found that PMG was EG's agent. *Id.*; *see also Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) ("[I]t is well-established that '[i]t is not essential that [the principal make] use of [the right to control], or even that a principal's 'efforts to control [be] effective.'" (alterations in original)); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 776 (N.D. Ill. 2014) ("Plaintiffs, however, allege sufficient facts to show that State Farm's insurance agents exercised a level of control over Variable's telemarketing activities (including the timing, target location, and volume of Variable's calls) to make the existence of an agency relationship between State Farm's insurance agents and Variable plausible.").



████████████████████████████████████████████

**B.  Google's** ████████████████ **Further Supports Venue in this District**

As confirmed in *SIT*, ████████████████████████████████

████████████████████████████████████████████

████████████████████████ meet the first *Cray* requirement. *See SIT*, 2020 WL 728165, at *4 ("[L]eased shelf space or rack space can serve as a 'place' under the statute . . . ."). Those locations are "of Google," satisfying the third *Cray* requirement, because

████████████████████████████████████████████

████████████████████████████████████████

Google's local ████████████████ also satisfy the second *Cray* requirement. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ There is no doubt that these places are "regular" and "established" as those terms were used in *Cray*. They also satisfy any requirement under *SIT* for there to be an employee or agent conducting the business. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ At oral argument in SIT, Google's counsel conceded that "in some circumstances, servicing the equipment is enough." Oral Argument at 5:43, *SIT*, 2020 WL 728165 (No. 2019-126), http://oralarguments.cafc.uscourts.gov/default.aspx?fl= 2019-126.MP3. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ In any event, this is far removed from the factual record before the Federal Circuit in *SIT*, where it was apparently "undisputed that no Google employee performed installation of, performed maintenance on, or physically accessed any of the GGC servers hosted by Cable One or Suddenlink." *SIT*, 2020 WL 728165, at *2. At the very least, given the new standards announced in *SIT*, further discovery concerning ████████████████████████████████ should be granted.

### C. *SIT* Does Not Foreclose GGC Servers as a Basis for Venue

#### 1.   *SIT's* Analysis of ISPs Is Limited to the Record on Mandamus

PMC originally argued that Google's GGC servers constitute a third basis for establishing venue in this district, in accordance with this Court's prior decision in *Seven Networks*. *See* Dkt. 88 at 23 (citing 315 F. Supp. 3d at 952). *SIT* does not disturb *Seven Networks'* finding that the rack space occupied by Google's GGC servers satisfies the third *Cray* factor, and affirmatively endorses *Seven Networks* in holding that this space is a "fixed, geographic location" within the meaning of the first *Cray* factor.[3] *See SIT*, 2020 WL 728165, at *4.

As to the second *Cray* factor, the *SIT* panel could not locate in the record on mandamus an employee or agent of Google that would meet its new standard for a "regular and established place

---

[3] As *SIT* did not resolve the timing question addressed in the parties' original submissions, PMC refers to its prior briefing on this issue. *See* Dkt. No. 88 at 22-24; *SIT*, 2020 WL 728165 at *1 n.1.

of business." *See* 2020 WL 728165, at *6-7. Specifically, *SIT* considered whether two ISPs in this district that host GGC servers act as agents conducting Google's business by analyzing three ISP-conducted activities as delineated in their contracts with Google. *See id.* (reviewing provisions on providing network access for, installing, and performing "basic maintenance activities" on GGC servers). Based on the language of these contracts, the Federal Circuit concluded that the ISPs do not act as agents of Google. *See id.* at *8. As the opinion did not cite any factual material from the confidential record other than the two contracts, additional facts—*e.g.*, the parties' course of performance, to the extent it diverged from the text of the agreements—could lead to a different determination. *See* Order, *In re Google LLC* (Fed. Cir. Nov. 18, 2019) (requesting that "the parties stipulate to supplement the record" specifically with non-confidential versions of the two agreements). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Further factual development is necessary on what the ISPs actually did for Google's GGC servers.

## 2. GGC Servers Conduct Business as Google's Agents

*SIT* intentionally leaves room for this Court to find proper venue in this district through the GGC servers themselves. *SIT* suggests that a machine might act as an "agent" conducting Google's business. *See* 2020 WL 728165, at *8. Much like the ATM machines discussed in this Court's decision in *Seven Networks*, which the Federal Circuit expressly reserved in its analysis, *see id.*,

the GGC servers plainly "conduct" Google's business of storing and transmitting content to customers in the district under full control and oversight of Google.[4] ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ *see also*

*SIT*, 2020 WL 728165 at *8 (Wallach, J., concurring) (suggesting conduct supporting "the core aspect of [Google's] business model" could be attributed to Google); *Seven Networks*, 315 F. Supp. 3d at 961 & n.42 (noting that "prompt delivery is a core aspect" of Google's business strategy).[5]

The GGC servers are Google's agents. *See SIT*, 2020 WL 728165, at *6 ("An agency relationship is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.'"). Congress has never distinguished between automated methods of conducting business and business conducted by humans, and in enacting the AIA, Congress assumed that the patent venue statute did cover machine-conducted business. *See* America Invents Act, Pub. L. 112-29, § 18(c) (specifically

---

[4] Indeed, while the Federal Circuit made clear that the nature of Google's business was not entirely clear, *SIT*, 2020 WL 728165, at *8 (Wallach, J., concurring), there is no question that one core Google business is transmitting advertising-supported (*i.e.*, revenue-generating) programming to customers. Google's public statements confirm this fact: "Google is largely a single online advertising business, with other smaller product areas within the Google ecosystem. While online advertising can be analyzed in many ways, it ultimately provides a single product to our customers and is managed as such." Ex. 4 at 9-10 (emphases added) (letter to the SEC explaining why Google's parent company Alphabet, Inc. does not report financial results separately for each Google business segment, such as YouTube).

[5] Google explains that it "generates revenues primarily from advertising, sales of digital content, apps and cloud offerings, and sales of hardware products." Ex. 4 at 2. Thus, ██████████████ ███████

exempting ATMs from § 1400(b)); *Seven Networks*, 315 F. Supp. 3d at 964 ("Any reading of the statutory requirements of § 1400(b) that inserts an extra-statutory requirement of human-centric activity at the 'regular and established place of business' necessarily renders this express [ATM] exemption superfluous."). Nothing in the record indicates a difference between automated devices such as ATM machines and Google's servers in the district. Furthermore, the concept of machine agents is not novel, and owes much to the common law of agency. *See, e.g.*, Unif. Computer Info. Transactions Act ("UCITA") § 107 cmt. 5 (2002) (describing the concept of an "electronic agent" as "embod[ying] principles like those in agency law," and comparing a human agent's "scope of authority" with an electronic agent's "intended purpose"); Stephen T. Middlebrook & John Muller, *Thoughts on Bots: The Emerging Law of Electronic Agents*, 56 Bus. Law. 341, 354 (2000) ("[I]t seems prudent to look to the same body of law [of agency] to inform, although perhaps not to govern absolutely, the relationships between people and their software servants.").[6]

The close association between Google's business model and the GGCs' function reflects the underlying fiduciary purpose of the principal-agent relationship: Google deploys GGCs to act in Google's interest and on Google's behalf. *See* Restatement § 1.01 cmt. e ("[T]he agent must act loyally in the principal's interest as well as on the principal's behalf."). Google retains an exclusive right of control over the GGCs, notwithstanding the ISPs' physical possession of the devices, another hallmark of the agency relationship. ████████████████████████████

████████████████████████████████████████████████████

---

[6] *See also State Farm Mut. Auto. Ins. Co. v. Bockhorst*, 453 F.2d 533, 536–37 (10th Cir. 1972) ("[h]olding a company responsible for the actions of its computer"); Restatement § 3.05 cmt. b ("Actions taken by computers and other machines, without immediate direction, can bind the party who chose to transact via computer."); Unif. Electronic Transactions Act § 2 (1999) (defining "electronic agent" as a "computer program or an electronic or other automated means used independently to initiate an action or respond to electronic records or performances in whole or in part, without review or action by an individual").

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Indeed, with respect to business function, there is little difference between GGC servers, which provide media content to Google's users, and movie rental kiosks, which supply similar entertainment on physical media. *See also Seven Networks*, 315 F. Supp. 3d at 956 n.33 (listing additional examples—"unattended gas pumps, vending machines, automated car washes, bike share kiosks, etc."—of machine-provided business services).

In *SIT*, the Federal Circuit also focused on the issue of service under 28 U.S.C. § 1694, reasoning that service should be possible where venue is appropriate under § 1400(b). *See* 2020 WL 728165, at *4-5. Any such requirement would be satisfied here. Rule 4 of the Federal Rules of Civil Procedure governs methods for serving process, and for corporate defendants like Google, permits service by "following state law . . . in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1); *see also* Fed. R. Civ. P. 4(h)(1)(A). The Texas Rules of Civil Procedure direct parties to serve the defendant in the first instance through personal service or registered or certified mail. Tex. R. Civ. P. 106(a). If the attempt is unsuccessful, however, the court may authorize service at "the location of the defendant's usual place of business or usual place of abode or other place where the defendant can probably be found" by (1) "leaving a true copy of the citation, with a copy of the petition attached, with <u>anyone</u> over sixteen years of age <u>at the location</u> specified in such affidavit"; or (2) "in any other manner that the affidavit or other evidence before the court shows will be reasonably effective to give the defendant notice of the suit." Tex. R. Civ. P. 106(b) (emphases added). Accordingly, leaving a summons with an employee at an ISP location hosting a GGC server, or following <u>any other method</u> for effecting service that the court considers reasonable, would satisfy the requirements of 28 U.S.C. § 1694.

### D.  **Google's Contacts Taken Together Plainly Establish Venue**

The Federal Circuit in *Cray* cautioned that venue is a fact-intensive inquiry that should consider the totality of the circumstances. 871 F.3d at 1366 ("We stress that no one fact is controlling."). The existing facts concerning Google's ███████████████████████████ and GGC servers "taken together" show that Google regularly uses employees, human agents, and machine agents to conduct core aspects of its business at physical locations in this district, thus satisfying § 1400(b). *Id.*; *cf. Seven Networks*, 315 F. Supp. 3d at 939 n.3 (noting that "both a virtual space and electronic communications may be indicative of the [venue] requirement having been met where additional facts are present" (emphasis added)).

### E.  **Additional Discovery Is Warranted**

In the event that this Court does not find the contacts discussed above to be dispositive of venue, additional discovery is warranted given the facts that *SIT* instructs courts to focus on. *See Uniloc USA, Inc. v. Apple Inc.*, No. 2:17-CV-00258-JRG, 2017 WL 3382806, at *1 (E.D. Tex. July 21, 2017) (considering the "entirety of the record to date and the reasonableness of the request" in granting leave to re-open venue discovery). The focus should be on:

- The nature of Google's business model and Google's relationship with third parties that promote or support Google's products and services in this district. *See SIT*, 2020 WL 728165, at *8 (Wallach, J., concurring) (noting possibility that "end users become agents of Google in furtherance of its business" by sharing data with Google, who then "monetizes" it).

- ████████████████████████████████████████████████████ *See* Dkt. No. 156 at 2.

- How Google's GGC program actually operates vis-à-vis ISPs and how Google or its agents instructs, controls, and interacts with GGC servers.

Dated: February 20, 2020

Respectfully submitted,

By: *Joseph S. Grinstein*

Arun Subramanian
New York Bar No. 4611869
Tamar Lusztig
New York Bar No. 5125174
Geng Chen
New York Bar No. 5377262
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019-6023
Telephone: (212) 471-8346
asubramanian@susmangodfrey.com
tlusztig@susmangodfrey.com
gchen@susmangodfrey.com

Joseph S. Grinstein
Texas Bar No. 24002188
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 653-7820
jgrinstein@susmangodfrey.com

S. Calvin Capshaw
Texas Bar No. 03783900
CAPSHAW DERIEUX LLP
114 E. Commerce Avenue
Gladewater, TX 75647
Telephone: (903) 845-5770
ccapshaw@capshawlaw.com

Dmitry Kheyfits
New York Bar No. 4743795
KHEYFITS P.C.
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (212) 203-5399
dkheyfits@kheyfits.com

*Attorneys for Personalized Media*
*Communications, LLC*

16

**Certificate of Service**

I certify that on February 20, 2020, I electronically served the foregoing on all counsel of record through the Court's ECF system.

*/s/ Tamar Lusztig*
Tamar Lusztig

**Certificate of Authorization to File Under Seal**

I hereby certify that this document is being filed under seal pursuant to the Court's authorization in the Protective Order entered in this matter.

*/s/ Tamar Lusztig*
Tamar Lusztig