**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 2:19-cv-00090-JRG <br><br> LEAD CASE |
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> NETFLIX, INC., <br><br> Defendant. | Case No. 2:19-cv-00091-JRG <br><br> MEMBER CASE |

**DEFENDANT NETFLIX INC.'S OPENING SUPPLEMENTAL BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS FOR IMPROPER VENUE**

# TABLE OF CONTENTS

**Page**

I. What sources of law should the Court consider in determining agency relationship, including, without limitation, the federal common law of agency in statutory contexts related to employment, such as the Fair Labor Standards Act, Title VII, or the Fair Housing Act?...............................1

II. Whether Netflix has a "regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place of business"? ...............................................................................4

    A. Netflix Irrevocably Transfers the Hardware to ISPs and Therefore Has No Right to Direct or Control the ISP's Actions. .........................................5

    B. The Software License Agreements Do Not Give Netflix Control of the ISPs. ...................6

    C. Netflix and the ISPs Lack the Required Consent for an Agency Relationship ...................8

    D. ISPs are Not Netflix's Agent Conducting Netflix's Business Even If the Deployment Guide Is Considered Mandatory ......................................................................9

III. Under what conditions "a machine could be an agent," and whether any such agent of Netflix exists within the Eastern District of Texas?..........................................13

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ballard v. PNC Fin. Servs. Group*,
  620 F. Supp. 2d 733 (S.D.W. Va. 2009) ................................................................................14

*In re BigCommerce, Inc.*,
  890 F.3d 978 (Fed. Cir. 2018) ................................................................................................14

*Burlington Indus. v. Ellerth*,
  524 U.S. 742 (1998) .................................................................................................................2

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) .................................................................................................................1

*In re Cordis Corp.*,
  769 F.2d 733 (Fed. Cir. 1985) ..................................................................................................4

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017) ................................................................................................2

*Dir. Of Office Workers' Compensation Programs v. Greenwich Collieries*,
  512 U.S. 267 (1994) ...............................................................................................................14

*In re Google LLC*,
  No. 2019-126, 2020 U.S. App. LEXIS 4588 (Fed. Cir. Feb. 13, 2020) ......................... *passim*

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999) .................................................................................................................3

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ...................................................................................................................14

*Meyer v. Holley*,
  537 U.S. 280 (2003) ........................................................................................................1, 2, 4

*Nationwide Mut. Ins. v. Darden*,
  503 U.S. 318 (1992) .................................................................................................................2

*Schnell v. Peter Eckrich & Sons, Inc.*,
  365 U.S. 260 (1961) .................................................................................................................3

*United States v. Texas*,
  507 U.S. 529 (1993) .................................................................................................................1

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947) .................................................................................................................2

**Statutes**

28 U.S.C. § 1694 .................................................................................................................13, 14

**Other**

Restatement (Third) of Agency § 1.01 ............................................................................1, 3, 8, 13

FILED UNDER SEAL - CONTAINS OUTSIDE AEO

Netflix, Inc. ("Netflix") submits this brief pursuant to the Court's Order for supplemental briefing (Dkt. No. 156) regarding the impact of *In re Google LLC*, No. 2019-126, 2020 U.S. App. LEXIS 4588 (Fed. Cir. Feb. 13, 2020) to Netflix's Corrected Motion to Dismiss, or in the alternative, Transfer for Improper Venue (Dkt. No. 62). As explained below, venue is not proper in this District.

I.  WHAT SOURCES OF LAW SHOULD THE COURT CONSIDER IN DETERMINING AGENCY RELATIONSHIP, INCLUDING, WITHOUT LIMITATION, THE FEDERAL COMMON LAW OF AGENCY IN STATUTORY CONTEXTS RELATED TO EMPLOYMENT, SUCH AS THE FAIR LABOR STANDARDS ACT, TITLE VII, OR THE FAIR HOUSING ACT?

Because there is nothing in the governing statute to suggest that Congress intended to alter the way agency works in the context of determining venue, the federal common law of agency applies.[1] *See United States v. Texas*, 507 U.S. 529, 534 (1993) (explaining that "courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except when a statutory purpose to the contrary is evident") (internal quotation marks and citation omitted); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) ("[W]hen we have concluded that Congress intended terms . . . to be understood in light of agency law, we have relied on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms.").

Indeed, in *In re Google,* the Federal Circuit expressly relied on the federal common law (as articulated in the Restatement (Third) of Agency § 1.01) to evaluate the question of whether the Internet Service Providers ("ISPs") were Google's agents.[2] *See In re Google*, 2020 U.S. App.

---

[1] An agency relationship is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01.

[2] Although the *In re Google* Court did cite *Meyer v. Holley*—a Federal Housing Act case that briefly mentions Title VII, it did not rely on any provision of either statute to resolve the agency

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS – Page 1**

LEXIS 4588, at *15-19; *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 755 (1998) (the Restatement "is a useful beginning point for a discussion of general agency principles"). Although the Federal Circuit did not issue explicitly announce that federal common law controlled, the fact that it applied federal common law to the *exact* questions at issue here should be dispositive.

While the application of agency federal common law in other contexts *may* be relevant to understanding the basic principles of agency, that authority should be given substantially less weight than the Restatement principles relied upon by the Federal Circuit in *In re Google*. Why? Because context matters. A court applying federal common law to an employment statute, for example, must take into consideration the statutory aims or legislative intent of that statute—factors that have no bearing on the application of agency to patent venue. Indeed, the Federal Circuit has specifically cautioned against conflating *other* areas of law with the patent venue inquiry, warning that "[c]ourts should be . . . careful not to conflate showings that may be sufficient for other purposes . . . with the necessary showing to establish proper venue in patent cases." *In re Cray Inc.*, 871 F.3d 1355, 1361 (Fed. Cir. 2017).

The Fair Labor Standards Act ("FLSA") is prime example of the pitfalls of ignoring context. In interpreting the FLSA, courts have stretched or exceeded traditional common law limits in order to accommodate Congress's intent to enact a broad definition of "employee" in the statute. *See, e.g., Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the "striking breadth" of the term "employ" in the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"); *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947) ("[I]n determining who are 'employees' under the Act, common law meployee [sic] categories or employer-employee

---

question. 2020 U.S. App. LEXIS 4588, at *15-16. Rather, it quoted *Meyer* for the limited purpose of setting forth the Supreme Court's articulation of the "essential elements of agency." *Id.*

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** – Page 2

classifications under other statutes are not of controlling significance."). Importing agency principles from FLSA cases into the patent venue statute would therefore risk distorting the statutory aims of the patent venue statute. It would also ignore (1) the Supreme Court's holding that (unlike the FLSA) the patent venue statute should be construed narrowly (*Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262-264 (1961)) and (2) the Federal Circuit's tacit approval of the Restatement principles as the proper source of law for agency questions in the patent venue context in *In re Google*.

Unlike the FLSA, Title VII and the Fair Housing Act ("FHA") generally apply federal common law. *See, e.g.*, *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 542 (1999) (the interpretation of Title VII is "informed by the general common law of agency," as codified in the Restatement of Agency) (internal quotation marks and citation omitted). Thus, cases relating to the application of the federal common law of agency to those statutes may inform a Court's determination of venue, and have somewhat lower risk of distortion than the FLSA cases. But those cases would still need to be individually scrutinized to confirm that (1) they are applying the traditional principles of federal common law and (2) they are not otherwise influenced by factors inapplicable to the patent venue statute.

The bottom line is that both the holdings of the Supreme Court and the Federal Circuit's decision in *In re Google* strongly point towards federal common law, as articulated in the Restatement, as the proper source of agency principles for evaluating patent venue. Resorting to cases purporting to apply federal common law in other contexts has not been *prohibited*, but at the end of the day, either those cases are *consistent with* the Restatement principles (in which case they are merely cumulative) or they *conflict* with the Restatement principles (in which case they should likely be disregarded as distortions influenced by the goals of their statutory context).

II.  **WHETHER NETFLIX HAS A "REGULAR, PHYSICAL PRESENCE OF AN EMPLOYEE OR OTHER AGENT OF THE DEFENDANT CONDUCTING THE DEFENDANT'S BUSINESS AT THE ALLEGED PLACE OF BUSINESS"?**

Netflix does not have a regular, physical presence of an employee or other agent conducting Netflix's business at the alleged place of business. Netflix has only three employees in this district. Dkt. No. 62-01 (Nguyen Decl.) ¶ 19. They each work out of their home.[3] *Id.* at ¶ 22. None work at the ISPs in this district—Netflix's alleged places of business. *Id.* Therefore, the only question for this Court is whether Netflix has any *agents* at the ISPs who conduct Netflix's business. It does not.

As discussed above, this question is governed by federal common law. Under federal common law, "[a]n agency relationship is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.'" *In re Google*, 2020 U.S. App. LEXIS 4588, at *15 (quoting Restatement (Third) of Agency § 1.01). "The essential elements of agency are (1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by [the principal] to [the agent] that the [agent] shall act on his behalf,' and (3) the 'consent by the [agent] to act.'" *Id.* at *15-16 (quoting *Meyer v. Holley*, 537 U.S. 280, 286 (2003)).

Neither the ISPs nor the people who work at the ISPs are agents of Netflix. Not one of the contracts between Netflix and the ISPs gives Netflix the "right to direct or control" the ISP's actions. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■ This fact should be dispositive because it negates two of the three

---

[3] Netflix previously explained why the homes of these work-from-home employees do not qualify as Netflix's regular and established place of business under *In re Cordis Corp.*, 769 F.2d 733 (Fed. Cir. 1985). *See* Dkt. No. 62 at 9, fn. 10. PMC did not dispute this conclusion during the previous venue briefing.

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** – Page 4

"essential elements" of the agency test: consent by the principal and the agent.

Moreover, the types of activities that the ISPs perform are highly analogous to (although more limited than) the activities considered and rejected by the Federal Circuit in *In re Google*. In that case, the Federal Circuit expressly found that (1) the provision of connectivity to customers and the internet did not create an agency relationship, and (2) the acts of installation and hardware maintenance, while potentially a closer question on agency (given that Google owned those servers), did not qualify as the conduct of Google's business. Given that the obligations Google imposed on its ISP partners go far beyond anything PMC has even alleged Netflix to require,[4] the same result should apply here.

### A. Netflix Irrevocably Transfers the Hardware to ISPs and Therefore Has No Right to Direct or Control the ISP's Actions.

The alleged Netflix places of business, according to PMC, are the ISPs operating Open Connect Appliances ("OCAs"), which are servers running Netflix software. *See* Dkt. No. 62 at 1-3 (discussing OCAs and content delivery networks). Netflix ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ of the hardware (the server) to the ISPs. Dkt. No. 62-01 (Nguyen Decl.), Ex. 1 ("Hardware Transfer Agreement") at § 1. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬ Thus, *ISPs*—▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬—*are entitled to use the hardware however they chose.* The ISPs are also ▬▬▬▬▬▬▬▬▬▬▬▬▬▬.[5] *Id.* at § 2 (▬▬▬▬▬▬

---

[4] As discussed in numerous places, Netflix does not agree that it requires the ISPs to do anything. *See e.g.*, Dkt. No. 62 (Netflix's Corrected Motion to Dismiss) at 6-10; Dkt. No. 95 (Netflix's Reply in support of Motion to Dismiss) at 2-16.

[5] As discussed in the next section, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS – Page 5**

██████████████████████████████████████████████████████). Netflix therefore has no right to "direct or control" the ISPs actions (the first element of agency).

      **B.**      **The Software License Agreements Do Not Give Netflix Control of the ISPs.**

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████

      PMC argues that the SLA creates an affirmative obligation on the ISP to use the Netflix-provided hardware as an OCA—*i.e.* that the ISP must run Netflix's software on that hardware. Dkt. No. 105 (PMC Sur-Reply) at 2-3. In short, PMC's argument is that an ordinary license agreement—which conditions use of software on certain terms—contains ***an affirmative obligation*** to use the software. This is both wrong and without support. *Id.* The only evidence in the record confirms Netflix's position that the software license is what it says it is: a software license. First, the Deployment Guide, ██████████████, makes it clear that the ISP is free to decide whether or not to deploy the OCAs in its network at all. Dkt. No. 62-01 (Nguyen Decl.), Ex. 11 ("Deployment Guide") at 4 ("If embedded OCAs are warranted ***and you decide to deploy them in your network*** . . .") (emphasis added). ████████████████████████████
████████████████████████████████████████████████████████████████

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** – Page 6

███████████████████████████████████████████████████████ Second, the Deployment Guide (███████████████████████████) expressly says that the ISPs can decide to take their OCAs offline: "If you need to make changes to the OCAs in an established site – for example, if you intend to . . . disable one or more OCAs for a significant period of time – it is important to notify the Open Connect team . . . ." *Id.* at 20. This provision specifically contemplates that the ISP—on its own accord—can unilaterally decide to stop operating its server as an OCA. What does Netflix say about it? "It is important" (not required) that the ISP *notify* Netflix. The fact that the very documentation on which PMC relies specifically acknowledges that ISPs can turn their OCAs off defeats PMC's argument that *that documentation* contractually obligates ISPs to operate the OCAs. Finally, we have Netflix's own testimony about the meaning of this contractual language and how this language has been interpreted in practice:



Dkt. No. 95-01 (Roberts Supp. Decl.), Ex. 10 at 62:6-12. There is no evidence to suggest that ISPs are required to operate their hardware as an OCA. The language of the Deployment Guide is inconsistent with that notion, and the only available testimony shows that the ISPs do not have such an obligation, and the actions of the ISPs reflect the same understanding. Accordingly, even if the Court were to find (despite the express repudiation of both Netflix and the ISPs) that Netflix and the ISPs had *consented* to a principle and agent relationship, no principle/agent relationship would in fact have been formed because Netflix lacks the "right to direct or control" the ISPs, and as such, there is no agency relationship formed.

### C. Netflix and the ISPs Lack the Required Consent for an Agency Relationship

An agency relationship requires that the principal consent to the agent *acting on the principal's behalf*, and that the agent consents to so act. Restatement (Third) of Agency § 1.01. The only evidence in the record on this point is an express repudiation by Netflix and the ISPs that any such consent is given:

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

SLA at § 12 (emphasis added). An agency relationship would require that Netflix consents to ISPs taking actions on behalf of Netflix, but the Agreement expressly disclaims any such consent.

The consequence for finding agency under these circumstances would be draconian and grossly unfair, not just to Netflix, but to the ISPs as well. "[T]he concept of agency posits a *consensual* relationship in which one person . . . acts on behalf of another person with *power to affect the legal rights* and duties of the other person." Restatement (Third) of Agency § 1.01 (emphasis added). The unfairness to Netflix would come from the fact that, without so intending, ISPs have the ability to affect the legal rights of Netflix. By the same token, the ISPs would, without having consented, gained a fiduciary obligation that would limit their ability to deploy the OCAs and expressly curtail their ability to take advantage of all of the discretion granted them in the Deployment Guide. The record is devoid of any indication that Netflix has ever consented to the ISPs acting in any way that affect Netflix's legal rights, nor any indication that the ISPs consented to any such relationship. In fact, the *only* evidence says the exact opposite:  SLA at § 12. Thus, even if the Court were to find that Netflix had some control over the ISPs by virtue of the contracts, the consent necessary to form an agency relationship is non-existent.

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** – Page 8

### D. ISPs are Not Netflix's Agent Conducting Netflix's Business Even If the Deployment Guide Is Considered Mandatory

Even if the Court were to find that an agency relationship exists here, the employees of the ISPs are not agents of Netflix *conducting Netflix's business*, which is supplying a streaming entertainment service to its subscribers. The Federal Circuit's analysis of Google's ISPs in *In re Google* is instructive. As explained by the Court, "Google's business includes providing video and advertising services to residents of the Eastern District of Texas through the Internet." *In re Google*, 2020 U.S. App. LEXIS 4588, at *3. In determining whether Google's ISPs were agents conducting Google's business, the Court discussed three functions (network provisioning, installation, and maintenance) that the ISPs would perform for Google. To the extent that the Netflix contracts impose any obligations on ISPs, those obligations are only a subset of the ones Google *actually imposes* on its ISPs. Despite this, the Federal Circuit found that *none* of the installation and/or maintenance requirements imposed by Google "constitute[d] the conduct of a 'regular and established business'" of Google. The same should be true here.

*First*, the Court explained that Google's ISPs provide Google a *service* of supplying the GGC servers with access to the internet. To the extent Netflix's ISPs are performing a service for Netflix, it is the same service that the Court analyzed in *In re Google*. A comparison between the facts the Court discussed in *In re Google* and the "requirements" in Netflix's Deployment Guide demonstrates the overlap:

| Actions of the ISPs in *Google* | Actions of Netflix's ISPs |
|---|---|
| "[T]he ISP provides the GGC servers with network access, i.e., a connection to the ISP's customers, as well as the public Internet." *In re Google*, 2020 U.S. App. LEXIS 4588, at *16. | "You must be able to provision 2-4 x 10 Gpbs ethernet ports in a LACP LAG per OCA." Deployment Guide at 5.<br><br>"As soon as you receive your OCA shipment, you are responsible for: [r]acking the appliance, [p]roviding the necessary 2-4 x 10 Gbps optical network connections" Deployment Guide at 9-10. |
| "The ISP provides Google with a service, and Google has no right of interim control over the ISP's provision of network access beyond requiring that the ISP maintain network access to the GGC servers and allow the GGC servers to use certain ports for inbound and outbound network traffic." *Id.* at *16. | ISP should have the network capacity "to handle 1.2 Gbps of inbound traffic for a 12-hour period per appliance" Deployment Guide at 5.<br><br>"If you absolutely must filter, the current list of inbound and outbound usage follows" Deployment Guide at 15 (identifying ports for inbound and outbound traffic). |

The Federal Circuit concluded that an ISP's provisioning of such a service does not transform the ISP into an agent of Google. *In re Google*, 2020 U.S. App. LEXIS 4588, at *16. For the same reason, such a service cannot transform ISPs into Netflix's agents.

*Second*, the Federal Circuit discussed the ISP's installation of servers. The Court identified six actions that Google's ISPs were required to take. *Id.* at *16-17. To the extent the Court interprets the Deployment Guide as requiring ISPs to act here, the actions described in the Deployment Guide are consistent with the "installation activities" described in *In re Google*. The following table compares the relevant activities:

| **Installation Activities in *Google*** | **Installation Activities Described in Netflix's Deployment Guide** |
|---|---|
| "[c]o-ordination with logistics and shipping personnel;" *In re Google*, 2020 U.S. App. LEXIS 4588, at *17. | ISP's "Logistics representative" "directs the shipment of OCAs" p. 6<br><br>"You will be asked to confirm site readiness before any OCAs are shipped to you" p. 8 |
| "inventory of equipment received;" *Id.* | |
| "[u]npacking equipment;" *Id.* | |
| "[a]ssembling equipment based on information and instructions provided by Google; . . ." *Id.* | "You must be able to physically install OCAs at your assigned site within 10 business days of receipt, or as soon as possible thereafter" p. 5<br><br>"As soon as you receive your OCA shipment, you are responsible for: [r]acking the appliance, [p]roviding the necessary 2-4 x 10 Gbps optical network connections" p. 9-10 |
| "[c]onnecting equipment to power strip(s) and Ethernet cable(s);" *Id.* | "You must be able to provision 2-4 x 10 Gpbs ethernet ports in a LACP LAG per OCAP p. 5<br><br>"Power supply maximum power output[:] 750 W" p. 5<br><br>ISP's "Data center operations" "installs OCAs on the partner network" p. 6<br><br>"Router interface configuration. When you are connecting the appliances to your router, follow the guidelines in this section." p. 14 |
| "[and] [p]owering up equipment & executing installation scripts configuring IP address information." *Id.* | "After the initial installation, the next step is to establish a BGP session with the appliance . . . The appliance will not start serving client traffic until both you and Netflix have agreed that the system is healthy and ready to serve, and when acceptable offload can be achieved." p. 11-12 |

The Federal Circuit concluded that "we do not consider the ISPs performing these installation functions to be conducting Google's business within the meaning of the statute. The installation activity does not constitute the conduct of a 'regular and established' business, since it is a one-time event for each server." *In re Google*, 2020 U.S. App. LEXIS 4588, at *17. As above,

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS – Page 11**

even assuming the Deployment Guide is a requirement, the ISPs who install OCAs are "required" to perform some (not all) of the same actions as the ISPs in *In re Google*. The ISPs here are therefore not agents conducting Netflix's regular and established business for the same reason.

***Third***, the Federal Circuit considered the ongoing maintenance activities of the GGC servers in *In re Google*. Again, the Court highlighted six actions that Google may ask of its ISPs from time to time. These activities are permitted "only with specific and direct step-by-step instructions from Google." *Id.* at *18. Netflix's Deployment Guide discusses some (not all) of these activities, but does not make them mandatory:

| **Maintenance Activities in *Google* Permitted Only with Specific Instructions from Google** | **Maintenance Activities Described in Netflix's Deployment Guide** |
|---|---|
| "physical switching of a toggle switch;" *In re Google*, 2020 U.S. App. LEXIS 4588, at *18. | |
| "power cycling equipment . . . ;" *Id.* | |
| "remote visual observations and/or verbal reports to Google on its specific collocation [sic] cabinet(s) for environment status, display lights, or terminal display information;" *Id.* | ISP's "Network engineer" "[p]rovides information about partner sites, OCA configurations, maintenance, and network routing" p. 6<br><br>ISP's "Network operations" "[w]orks with Netflix to troubleshoot routing and other configuration issues that might arise" p. 6<br><br>"Depending on the severity and impact to traffic [of an outage], we might ask relevant ISP partners for additional comments on the incident" p. 42 |
| "labeling and dress-up of cabling within cabinet;" *Id.* | |
| "tightening screws, cable ties, or securing cabling to mechanical connections, plug[s];" *Id.* | |
| "replacing existing plug-in only hardware such as circuit cards with spares or upgrades." *Id.* | "we may ask partners to replace PSU or optics on an appliance" p. 46 |

As seen from the foregoing, Google's contracts impose many more controls on its ISP's actions, even assuming that the suggestions and best practices outlined in the Deployment Guide are read

**NETFLIX'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** – Page 12

as obligations. For this reason as well, the ISPs are not conducting Netflix's regular and established business.

Finally, Netflix is in the business of providing a streaming entertainment service to its customers. The actions described in the Deployment Guide merely describe maintenance activities of the ISP's hardware. As the Federal Circuit observed in *In re Google*, "[m]aintaining equipment is meaningfully different from—as only ancillary to—the actual producing, storing, and furnishing to customers of what the business offers." 2020 U.S. App. LEXIS 4588, at *18-19. Simply put, the ISPs—however you characterize their relationship to Netflix—are not conducting the business of Netflix.

**III.   UNDER WHAT CONDITIONS "A MACHINE COULD BE AN AGENT," AND WHETHER ANY SUCH AGENT OF NETFLIX EXISTS WITHIN THE EASTERN DISTRICT OF TEXAS?**

As a matter of law, machines cannot be agents. As discussed above, an "agent" must have capacity to (1) act on the principal's behalf and subject to the principal's control and (2) manifest assent or otherwise consents to act. *In re Google*, 2020 U.S. App. LEXIS 4588, at *15 (Fed. Cir. 2020) (quoting the Restatement (Third) of Agency § 1.01). Although a machine may be susceptible to control, it lacks sufficient cognizance to *voluntarily* consent to act on behalf of a principal and to appreciate the implications of fiduciary responsibilities arising from an agency relationship. Only sentient beings can voluntarily give (or not give) consent. Thus, treating machines as agents would be a significant departure from longstanding agency principles.

At least in the patent venue context, "agents" must also be capable of receiving service of process under 28 U.S.C. § 1694. *In re Google*, 2020 U.S. App. LEXIS 4588, at *11-12. That statute, however, cannot reasonably be construed to encompass serving machines. Congress enacted § 1694 in 1897, the same year that the first patents on the ice cream scoop and the engine muffler issued. *See* U.S. Patent Nos. 576,395 and 582,485. There is nothing in the legislative

history to indicate that this nineteenth-century Congress contemplated serving complaints on these machines—much less that they contemplated that service would be appropriate on classes of machines that had not yet been invented. *See Standard Oil Co. v. United States*, 221 U.S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country[,] they are presumed to have been used in that sense unless the context compels to the contrary."); *Dir. Of Office Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 275 (1994) (interpreting a statute by presuming that "Congress intended the phrase to have the meaning generally accepted in the legal community at the time of enactment).

Moreover, Netflix could not find, after rigorous searching, a single case, in any context, where any court has ever held that a machine could be an agent. In fact, courts that have addressed the issue of serving agents have held that such agents must be legal persons. *See, e.g.*, *Ballard v. PNC Fin. Servs. Group*, 620 F. Supp. 2d 733, 740 (S.D.W. Va. 2009) ("It is well-established that when service is made on an agent, the agent must be a person of sufficient character and rank to make it reasonably certain that the defendant will be apprised of service made through that agent.") (internal quotation marks omitted).

Any attempt to allow computers to act as agents under the patent venue statute would violate the principle that courts cannot "ignore the requirements of the statute merely because different requirements may be more suitable for a more modern business environment." *In re BigCommerce, Inc.*, 890 F.3d 978, 985 (Fed. Cir. 2018). The OCAs and the end-user devices are the only machines at issue in this case. They cannot consent to an agency relationship. They cannot accept service of process. Thus, they cannot be agents under the patent venue statute.

Respectfully submitted,

*/s/ Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Kyle R. Akin
Texas Bar No. 24105422
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
Email: jdoan@haltomdoan.com
Email: kakin@haltomdoan.com

OF COUNSEL:

Clement Roberts
ORRICK HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Phone: 415-773-5700
Email: croberts@orrick.com

Alyssa Caridis
ORRICK HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
Phone: 213-629-2020
Email: acaridis@orrick.com\
**ATTORNEYS FOR DEFENDANT NETFLIX, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record were served with a true and correct copy of the foregoing by electronic mail on this 20th day of February, 2020.

*/s/ Jennifer H. Doan*
Jennifer H. Doan