IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, | § § § | |
| Plaintiff, | § § | **[FILED UNDER SEAL]** |
| v. | § § | CIVIL ACTION NO. 2:19-CV-00090-JRG |
| GOOGLE LLC, | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Google LLC's ("Google") Motion to Dismiss for Improper Venue (the "Motion to Dismiss") (Dkt. No. 32) and Defendant Google's Motion to Stay Pending Resolution of Its Motion to Dismiss for Improper Venue (the "Motion to Stay") (Dkt. No. 224) (collectively, the "Motions"). Having considered the Motions, the parties' briefing, and their oral arguments, the Court finds that the Motion to Dismiss and the Motion to Stay should be **DENIED**.

### I. PROCEDURAL BACKGROUND

On March 21, 2019, Personalized Media Communications, LLC ("PMC") filed a Complaint for patent infringement against Google alleging that it infringes six of PMC's patents relating to adaptive video streaming. (Dkt. No. 1). On June 6, 2019, Google filed the present Motion to Dismiss. (Dkt. No. 32). Briefing on this Motion to Dismiss was completed on September 9, 2019. (Dkt. No. 106). This Court set the Motion to Dismiss for oral argument on February 13, 2020. (Dkt. No. 154). However, on February 13, 2020, but before the scheduled hearing on the Motion to Dismiss, the Federal Circuit issued its opinion in *In re Google LLC*. *In re Google LLC*, 949 F.3d 1338 (Fed. Cir. 2020). In light of this, the Court cancelled the previously

scheduled oral argument and ordered supplemental briefing in light of the Federal Circuit's opinion. (Dkt. No. 156). The supplemental briefing was completed on February 27, 2020. (Dkt. No. 169). The Federal Circuit denied rehearing *en banc* as to *In re Google* on May 15, 2020. (Fed. Cir. Case No. 19-126, Dkt. No. 50).

The Motion to Dismiss was then reset for oral argument to be held on July 13, 2020. However, on July 2, 2020, Google filed the Motion to Stay. (Dkt. No. 224). This Court then ordered expedited briefing on the Motion to Stay and set the Motion to Stay for oral argument concurrently with the Motion to Dismiss. (Dkt. No. 226). The Court heard oral argument on both Motions on July 13, 2020. (Dkt. No. 250).

## II.  LEGAL AUTHORITY

Under the patent venue statute, 28 U.S.C. § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." There is no dispute that Google does not reside in Texas. (Dkt. No. 252 at 4:14–17).

The Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, ––– U.S. –––, 137 S. Ct. 1514, 1517 (2017), held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." Furthermore, the Federal Circuit's decision in *In re Cray, Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017), held that a "regular and established place of business" under the patent venue statute must be: (1) "a physical place in the district"; (2) "a regular and established place of business"; and (3) "the place of the defendant." 871 F.3d at 1360.

In *In re Google*, the Federal Circuit further clarified that a "regular and established place of business" requires the regular, physical presence of an employee or other agent of the defendant

conducting the defendant's business at the alleged "place of business." 949 F.3d at 1345.

### III. DISCUSSION

PMC argues that venue is proper in the Eastern District of Texas because Google has committed acts of infringement and has a regular and established place of business in the Eastern District of Texas based on: (1) Google's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the District; (2) the "Flower Mound Facility" in the District; and (3) Google's Global Cache ("GGC") Servers in the District. (Dkt. No. 88 at 1, 5, 18). This Court finds that venue is proper in the Eastern District of Texas based on the Flower Mound Facility. Consequently, the Court does not address Google's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or its GGC Servers as they relate to venue.

Venue is proper in the Eastern District of Texas under 28 U.S.C. § 1400(b) because the Flower Mound Facility is a regular and established place of business of Google as defined in *In re Cray* and clarified in *In re Google*, and PMC has sufficiently alleged that Google has committed acts of infringement in the Eastern District of Texas. *See In re Cray*, 871 F.3d at 1360; *In re Google*, 949 F.3d at 1345.

### a. The Flower Mound Facility is a Regular and Established Place of Business of Google

#### i. The Flower Mound Facility is "a physical place in the district"

It is undisputed that the Flower Mound Facility is located at 700 Lakeside Parkway, Flower Mound, Texas 75028 and that such location exists wholly within the Eastern District of Texas. (Dkt. No. 88 at 19; Dkt. No. 88-30 at 1; Dkt. No. 97 at 16). The Flower Mound Facility is owned by Communications Test Design, Inc. ("CTDI"). (Dkt. No. 161 at 10). On August 15, 2017, CTDI and Google entered into an Inbound Services Agreement (the "ISA"), and on May 15, 2018, Google and CTDI entered into Statement of Work No. 463889 (the "SOW") regarding the Flower Mound Facility. (Dkt. No. 88-30 at 27; Dkt. No. 161-2 at 14). These documents make it clear that

3

Case 2:19-cv-00090-JRG Document 291 Filed 07/30/20 Page 4 of 13 PageID #: 29350

as between the ISA and the SOW, if there is "any conflict or inconsistency between the terms of th[e] SOW and the ISA, the SOW [] controls." (Dkt. No. 88-30 at 1, C.). Under the SOW and in accordance with the ISA, Google contracted with CTDI to refurbish, warehouse, and repair "certain Google products such as Google Home smartspeakers and Pixel smartphones" at the Flower Mound Facility. (*Id.* at § 6.2; Dkt. No. 88 at 18; Dkt. No. 97 at 15).

The Federal Circuit recently held that a "place" under *In re Cray* is not required to have the characteristics of real property or a leasehold interest. *In re Google*, 949 F.3d at 1343. Rather, a "place" can be "any physical place that the defendant could possess or control." *Id.* (internal citations omitted). Under the SOW, CTDI must repair, refurbish, and warehouse Google devices at the Flower Mound Facility. (Dkt. No. 88-30 at § 6.2). Any change from this location must be agreed to in writing by Google. (*Id.*). Furthermore, the SOW grants Google a specific and defined space within the Flower Mound Facility called the "Google Secured Area" where all repair, refurbishment, and warehousing activities are to be conducted. (*Id.* at 4, 42). In the SOW, Google further specifies that the Google Secured Area must "have walls from floor to ceiling" and "be fully separate from other operations." (*Id.* at 4). Accordingly, Google has a dedicated, physical space for its operations within the Flower Mound Facility. Under the SOW, Google has control over the Google Secured Area and has dictated the specifications for the Google Secured Area. (*Id.*). Only Google devices can be stored, repaired, or refurbished in the Google Secured Area. (*Id.*). Further, the location of the Google Secured Area cannot be moved outside of the Flower Mound Facility without the express written consent of Google. (*Id.* at § 6.2). Accordingly, the Flower Mound Facility, and more specifically, the Google Secured Area within it, is a physical place in the Eastern District of Texas satisfying the first *Cray* factor.

  ii. <u>The Flower Mound Facility is "a regular and established place of business"</u>

The Federal Circuit recently clarified that to satisfy the second *Cray* factor, "a 'regular and established place of business' requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345. This factor is satisfied because CTDI acts as Google's agent conducting Google's business at the Flower Mound Facility.[1]

In this case, the existence of an agency relationship is governed by Federal Circuit law. *In re Cray*, 871 F.3d at 1360; (Dkt. No. 161 at 4; Dkt. No. 167 at 1). As the Federal Circuit recently recounted, "[t]he essential elements of agency are (1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act." *In re Google*, 949 F.3d at 1345 (internal citations and alterations omitted). The Federal Circuit also noted, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* at 1345–46 (citing Restatement (Third) of Agency § 1.01 cmt. f(1)).

---

[1] On December 13, 2019, *In re Google* was argued before the Federal Circuit. (Fed. Cir. Case No. 19-126, Dkt. Nos. 23, 35). Judge Evan Wallach's concurrence makes it clear that Google was asked "what do you do in the Eastern District?" Google's response was "what Google does in the District will depend on what the subject of that verb is." *In re Google*, 949 F.3d at 1348. Both the ISA and the SOW between Google and CTDI existed and were operative when Google gave that answer to Judge Wallach. During the argument on the present Motions before this Court, PMC argued:
> . . . I think Your Honor may be asking yourself the question, well, if venue as to CTDI is so straightforward, how come PMC, as far as I'm aware, is the first party that's come to Your Honor and argued venue as to CTDI? Certainly Super Interconnect did not. And the answer to that question is Google hides CTDI. That's the answer to the question. They hide it obviously to customers. Customers have no idea CTDI is out there, and as a result, litigants don't know it's out there, and they do a pretty good job of hiding it in discovery.

(Dkt. No. 253 at 34:14–24). These recitals raise serious questions about the candor of Google and its counsel with the Circuit Court and serious questions about their good-faith compliance with their discovery and disclosure obligations before the trial court. While this opinion is not the place to resolve such questions, they are serious enough to be identified herein, even if their ultimate resolution must wait for another day.

5

Case 2:19-cv-00090-JRG Document 257 *SEALED* Filed 07/16/20 Page 6 of 13 PageID #: 16982

Google has the right to, and does—in fact—direct and control CTDI's actions within the Google Secured Area in Flower Mound. Google prescribes how to perform each step of CTDI's services and retains control of the actions CTDI undertakes for Google. For example, the SOW requires CTDI to "collect data and deliver reports to Google" for more than twenty different types of reports, some of which must be delivered to Google *daily or multiple times a day*. (Dkt. No. 88-30 at § 6.14, Ex. E). ("[CTDI] will report to Google the received number of Returned Products, using the RMA numbers, multiple times during the day…" (Dkt. No. 88-30 § 6.5)). CTDI must also "appoint an account representative to work with Google on all Service-related issues[,]" "conduct a bi-weekly call with Google" regarding "trends in recurring failures[,]" and identify "allocate[d] [human] resources" for Google. (*Id.* at § 9.1, Ex. M). In short, Google controls and oversees virtually every aspect of how CTDI performs its services, including how it receives, diagnoses, repairs, warehouses, packages, and ships the Google devices.

The SOW is replete with provisions affording Google the right to give interim instructions to CTDI which further evidence CTDI's agency relationship. For example:[2]

- "**Google may change the levels of refurbishment at any time** with written notice . . . **[CTDI] will implement such changes.**" (*Id.* at § 6.9(B));
- "[CTDI] will provide the following OOW Services, **unless instructed otherwise in writing by Google** . . ." (*Id.* at § 6.9(G));
- "**Google may, at its sole discretion, direct [CTDI]** to purchase materials from a third party vendor." (*Id.* at § 8.1(D));
- "[CTDI] will generate and apply a label . . . **as directed by Google**." (*Id.* at § 6.10(A));

---

[2] Bolding represents emphasis added by the Court not present in the SOW.

6

- "[CTDI] will change the Part Numbers of all the Returned Products (**as directed by Google**) (*Id.* at § 6.6);

- "**Google may require [CTDI]** to add, remove, or amend any of the above information on labelling." (*Id.* at § 6.10(B));

- "**Google may direct [CTDI]** to warehouse Products at one of its Locations for a specified period of time." (*Id.* at § 6.11(C));

- "The accessories or any other materials which do not form any incoming Returned Product and which do not have any associated RMA will be quarantined by [CTDI] for disposal or reuse, **as instructed by Google**." (*Id.* at § 6.5(A));

- "[CTDI] may provide Kitting Services . . . **in accordance with Google's instructions**." (*Id.* at § 6.10(D));

- "**Google may request [CTDI]** to locate and ship received individual or multiple Product(s) to a specified address." (*Id.* at § 6.11(E));

- "**Upon request, [CTDI] will report to Google** the data wipe outcome . . . . [CTDI] will also store and maintain all data wipe records . . . and produce such records **for Google upon request**." (*Id.* at § 6.7(B));

- "[CTDI] will install the latest version of the operating system . . . **as instructed by Google**." (*Id.* at § 6.8(A));

- "[CTDI] will perform basic functionality testing . . . **with instructions provided by Google**." (*Id.*);

- "[CTDI] will mark the Returned Product as IW Product **in accordance with Google's instructions**. . ." (*Id.* § 6.9(A)).

In addition, under section 6.15 of the SOW, CTDI is required to implement not only every

7

reasonable interim instruction provided by Google, but *every change that Google demands unless it affects CTDI's profitability*. (*Id.* at § 6.15). Thus, Google has the right to, and does, direct and control the actions of CTDI.

Google also authorizes CTDI to act on its behalf. Google tells its customers to send their devices to "us"—*i.e.*, Google—at the Flower Mound Facility. (Dkt. No. 88-32 at 3; Dkt. No. 88-33 at 2). "Google system logic" also directs customers to send their particular phones to the Flower Mound Facility for repairs. (Dkt. No. 162-2 at 199:2–8). After CTDI repairs or refurbishes the Google devices, Google requires CTDI to return the devices to its customers in Google branded packaging. (Dkt. No. 88-31 at 254:20–55:20; 256:5–12; 257:8–58:12). In fact, the existence of CTDI is hidden and Google undertakes to insure that its customers have no idea that CTDI exists. (Dkt. No. 253 at 4:9–10, 5:9–10) ("So there's no exposure to the public of this contract. The contract itself is confidential . . . . In fact, the public has no idea that CTIDD [sic] – CTDI facility is even working on this."). In short, Google authorizes CTDI to act on its behalf, keeps CTDI secret from Google's customers, and causes CTDI to hold itself out as Google as part of its interactions with those customers.

Lastly, CTDI consents to act on Google's behalf.[3] In the SOW, CTDI agreed "to provide Google the Services specified" including "tak[ing] receipt of Returned Products (whole/finished Products and Product components and parts), Quarantine Services, Capture Services and Sorting Services," "Part Number Transformation Services," "Triage Services," "Data Wipe Services," "IW Services, OOW Services, SUR Services, Scrap Services, Refurbishment Services and Fulfillment Services in relation to Defective Products (as applicable), Labelling Services,"

---

[3] "Consent" is defined by Black's Law Dictionary as "a concurrence of wills." *Consent*, BLACK'S LAW DICTIONARY (4th ed. 1968). Here Google and CTDI have mutually arrived at just such a concurrence of wills as reflected in the extensive acts that CTDI performs for Google subject to its continuing direction and control. *See id.*

8

"Harvesting Services," "Inventory Procurement and Management Services," "Warehousing Services," "Shipping Services," "Reporting Services," and "VAS." (Dkt. No. 88-30 at § 6.1(A)-(K)). Among its many services, CTDI consents to "refurbish" and "ship" Google devices on behalf of Google as delivered to it by Google's customers pursuant to Google's instructions. (*Id.* at § 6.1(H)-(I)). As noted, Google instructs its customers to send their devices to Google for repairs at the Flower Mound Facility and Google's customers "ha[ve] no idea that [the] CTDI Facility is even working on this." (Dkt. No. 88-32 at 3; Dkt. No. 88-33 at 2; Dkt. No. 253 at 5:9–10). As such, CTDI acts on behalf of Google in conducting the refurbishment and repairs of Google devices and returning those devices to Google's customers in Google branded packaging. Accordingly, in light of Google's ability to direct and control the CTDI's actions on an ongoing basis, Google's consent for CTDI to act on its behalf, and CTDI's consent to act as such, the Court finds that, in this case, CTDI is Google's agent.

Additionally, it is clear that CTDI "conduct[s] [Google's] business at the alleged "place of business." *See In re Google*, 949 F.3d at 1345. In determining what constitutes "conducting business," the Federal Circuit in *In re Google* recently distinguished "activities, such as maintenance, that are merely connected to, but do not themselves constitute the defendant's conduct of business" from activities such as "production, storage, transport, and exchange of goods and services."[4] *Id.* at 1347. Part of Google's business is providing hardware, like Pixel phones and Google Home devices, to customers. (Dkt. No. 253 at 23:8–17); *see also*, Google Store, https://store.google.com/us/category/phones (last visited July 14, 2020). In addition to repairing

---

[4] It is worthy to note that the "maintenance" which the Federal Circuit held not to constitute the business of Google in *In re Google* was maintaining equipment (servers) which Google used to facilitate its online search engine services, with the online services (not the servers themselves) being Google's business. *In re Google*, 949 F.3d at 1346–47. Here, in contrast, the repairs, refurbishing, warehousing, and transport services provided flow directly to Google's customers and relate entirely to Google phones, Google Home devices, and other Google hardware which are clearly part of Google's business.

9

and refurbishing, CTDI stores and transports these Google hardware devices. (Dkt. No. 88-30). CTDI provides "Warehousing Services" and "Shipping Services" such that Google devices needing repair *and* Google inventory are stored in the Google Secured Area. (*Id.* at § 6.1 (H)–(I)). CTDI also ships the repaired or refurbished devices back to Google's customers. (*Id.* at § 6.12; Dkt. No. 97 at 18). By repairing and then returning Google hardware devices to Google's customers, as well as by storing Google inventory, CTDI conducts Google's business at the Flower Mound Facility. As such, CTDI is an agent that conducts Google's business at the Flower Mound Facility in satisfaction of the second *Cray* factor and as recently clarified in *In re Google*.

While, Google argues that CTDI is not an agent because it "performs [] service[s] for a wide range of companies other than Google," (Dkt. No. 161 at 10), it is established that "[a]n agent can serve multiple principals at once, even principals that are competing with one another," and that "an independent contractor can be an agent." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250–51 (10th Cir. 2013). Additionally, "one can be an agent of a principal without having authority to bind the principal to a contract with a third party." *Id.* at 1251.

Google also argues that because the ISA contains a boilerplate "No Agency" clause, CTDI cannot be Google's agent. (See Dkt. No. 161 at 12; Dkt. No. 161-2 at § 12.12). Specifically, section 12.12 of the ISA states, "[t]his Agreement does not create any agency, partnership, or joint venture between the parties." (Dkt. No. 161-2 at § 12.12). However, "it is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship." *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359 (Fed. Cir. 2016). Importantly, the SOW expressly controls over any conflicting language in the ISA. As described above, the SOW demonstrates all the essential elements of an agency relationship, including Google's extensive right of interim control. Accordingly, this Court is persuaded that the "No Agency" provision of

10

the ISA is not dispositive but rather inapposite in view of the controlling SOW and the material evidence of Google and CTDI's agency relationship.

### iii. The Flower Mound Facility is "the place of the defendant"

Lastly, the Flower Mound Facility is a place of Google in satisfaction of the third *Cray* factor. In *In re Cray*, the Federal Circuit specified that under this third factor, "the defendant must establish or ratify the place of business." *In re Cray*, 871 F.3d at 1363. Google both establishes and ratifies the Flower Mound Facility as its place of business. Google establishes this place of business by not only specifying the Flower Mound Facility as the location at which CTDI will provide services (*see* § 6.2 of the SOW), but also requiring there to be a Google Secured Area in the Flower Mound Facility. (Dkt. No. 88-30 at 4). Google then ratifies the Flower Mound Facility as its place of business by holding it out to be Google itself. Indeed, Google tells its customers to send their devices to "us" at the Flower Mound Facility. (Dkt. Nos. 88-32, 88-33) (Google support webpage stating that the provider of repair services in the United States is Google); *In re Cray*, 871 F.3d at 1363–64 (recognizing that "a defendant's representations that it has a place of business in the district are relevant"). Google's customers believe they are sending their Google devices to Google to be repaired—indeed, they "ha[ve] no idea that [the] CTDI Facility is even working on this." (Dkt. No. 253 at 5:9–10). Google acts purposefully to achieve this result. Accordingly, the Flower Mound Facility is a place of Google in satisfaction of the third *Cray* factor.

**b. PMC alleges Google has Committed Acts of Infringement in the District**

Google also challenges that PMC has sufficiently alleged that Google has committed acts of infringement in the Eastern District of Texas because PMC has not alleged that all of the steps in the claimed methods occur in this District. (Dkt. No. 32 at 7–10). This Court rejected this same argument in *SEVEN Networks* and stated that "not all of the alleged infringing activity needs to

11

have occurred within the District so long as some act of infringement took place there." *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 943 (E.D. Tex. 2018) (internal citations omitted). However, even if there were such a nexus requirement under § 1400(b) such a requirement would be met here by ▓▓▓▓▓▓▓▓▓▓ in the Eastern District of Texas. (Dkt. No. 88 at 25; Dkt. No. 1 ¶ 71 (alleging acts of infringement performed by Google's Eastern District of Texas "Points of Presence"); Dkt. No. 254 at 150:18–20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Accordingly, PMC has sufficiently alleged, for venue purposes, that Google has committed acts of infringement in the Eastern District of Texas.

\*\*\*

The Court brings this analysis to a conclusion by noting that this is a targeted ruling based upon the specific facts and circumstances before the Court. This opinion does not absolve plaintiffs of their continuing responsibility to file actions where venue is proper. However, the Court is persuaded that under these circumstances, and specifically in light of the Federal Circuit decisions in *In re Cray* and *In re Google*, venue is proper in this district as to this case.

### IV. CONCLUSION

In light of the foregoing, the Court finds that Google's Motion to Dismiss for Improper Venue should be and hereby is **DENIED**. (Dkt. No. 32). As a result, Google's Motion to Stay Pending Resolution of Its Motion to Dismiss for Improper Venue (Dkt. No. 224) is **DENIED AS MOOT**. In light of this holding, PMC's alternative request for further venue targeted discovery is **DENIED WITHOUT PREJUDICE**.

Additionally, the Court notes that this opinion is filed under seal, given that certain portions of the written record and oral arguments related hereto were presented under seal. However, sealing is never intended to deprive the public from everything written or said in a sealed matter,

but only those highly confidential matters which warrant exclusion from the public. In view of the Court's role as a public and open forum and the public's entitlement to all but the most confidential of information, the parties are **ORDERED** to meet and confer for the purpose of generating an appropriately redacted public version hereof to be subsequently filed herein, and the parties shall submit their agreements and disagreements (if any) regarding proper redactions to this Court for its consideration within ten (10) days hereof.

    **So ORDERED and SIGNED this 16th day of July, 2020.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE